*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2025 UT 34**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

KYLE MATHEWS and RYAN SORENSEN,
*Appellants,*

*v.*

CHARLES MCCOWN, CAMILLE HIGGINS, and JAY NIELSEN,
*Appellees.*

No. 20230662
Heard December 9, 2024
Filed August 14, 2025

On Direct Appeal

Third District Court, Tooele County
The Honorable Teresa L. Welch
No. 220301601

Attorneys:

Janet M. Conway, Wanship, Timothy C. Houpt, C. Michael Judd,
Salt Lake City, for appellants

Steve H. Bergman, Yuchen Cook, Salt Lake City, for appellee
Charles McCown

Robert E. Mansfield, Megan E. Garrett, Salt Lake City, for appellee
Camille Higgins

Brent N. Bateman, J. Tayler Fox, Justin T. Rich, John Tipton,
Salt Lake City, for appellee Jay Nielsen

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the
Court, in which JUSTICE PETERSEN, JUSTICE HAGEN,
JUSTICE POHLMAN, and JUDGE TENNEY joined.

Having recused himself, CHIEF JUSTICE DURRANT does not
participate herein; COURT OF APPEALS JUDGE RYAN D. TENNEY sat.

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1    Before January 2022, Erda was an unincorporated area of Tooele County. The record before us does not reveal whether Erda was a peaceful idyll before residents started exploring the idea of incorporation. But the record undoubtedly reflects a community awash in litigation since incorporation efforts began. Several lawsuits have been filed, and the public dialogue has been, at least at times, rife with accusations of fraud and misdeeds. This appeal arises out of those accusations.

¶2    Kyle Mathews and Ryan Sorensen (Appellants) sued Camille Higgins, Jay Nielsen, and Charles McCown (Appellees).[1] Appellants alleged that Appellees defamed them—and committed the tort of invasion of privacy/false light (false light)—when they publicly accused Appellants of a variety of bad acts in connection with Erda's incorporation. There is no question Appellees made the statements. But Higgins and Nielsen, who each filed a motion to dismiss, asserted that the statements were not capable of defamatory meaning and were privileged. McCown, for his part, claimed that his statements were protected because he made them while participating in the process of government. He filed a motion for judgment on the pleadings based on Utah's Citizen Participation in Government Act, which is also known as the Anti-SLAPP Act.

¶3    The district court granted Appellees' motions. The court concluded that Higgins's and Nielsen's "statements were made in the context of a public debate regarding the incorporation of Erda" and were therefore not capable of defamatory meaning. The court also ruled that the statements were privileged. The court dismissed Appellants' false light claims against Higgins and Nielsen for the same reasons. The court additionally concluded that the Anti-SLAPP Act protected McCown from the claims asserted against him and granted his motion for judgment on the pleadings.

¶4    Appellants contend that the district court erred when it ruled that Higgins's and Nielsen's statements were not capable of defamatory meaning and were subject to qualified privileges. They

---

[1] When referring to Sorensen, the parties toggle between "Sorensen" and "Sorenson." We opt to use Sorensen—the spelling used in the complaint and appellate captions.

argue that the district court incorrectly concluded that they failed to adequately plead their false light claims against Higgins and Nielsen. And they assert that the district court misinterpreted the Anti-SLAPP Act to hold that it shielded McCown from liability.

¶5 We see merit in Appellants' arguments. At least some of Higgins's and Nielsen's statements are capable of defamatory meaning. And the district court, on motions to dismiss, should not have dismissed the claims on privilege grounds. The district court also erred when it relied on those rationales to dismiss the false light claims. Finally, the Anti-SLAPP Act does not apply to McCown's statements. We reverse and remand.

## BACKGROUND[2]

*Incorporation of Erda*

¶6 According to the complaint, efforts to incorporate Erda began as early as 2018. Appellants were involved in those efforts. Mathews founded the Erda Community Association (ECA), an organization that helped sponsors place a ballot measure to incorporate Erda before voters. Mathews "worked actively—but quietly—in assisting sponsors of a ballot measure to incorporate the City of Erda." Sorensen served as one of five incorporation sponsors and as an ECA board member.

---

[2] Because the court decided motions to dismiss for failure to state a claim and a motion for judgment on the pleadings, "we accept the factual allegations in the complaint as true and interpret those facts, and all reasonable inferences drawn therefrom, in a light most favorable to the plaintiff as the nonmoving party" and "recite the facts accordingly." *1600 Barberry Lane 8 LLC v. Cottonwood Residential O.P. LP*, 2021 UT 15, n.1, 493 P.3d 580 (cleaned up); *see also Golding v. Ashley Cent. Irrigation Co.*, 793 P.2d 897, 898 (Utah 1990) (reciting the facts on appellate review of the grant of a motion for judgment on the pleadings in accordance with this standard of review). We stress that these allegations have yet to be tested or proven.

On the question of whether a statement is susceptible to a defamatory interpretation, we do not interpret "inferences that may be reasonably drawn from the statements in favor of a defamatory meaning." *Jacob v. Bezzant*, 2009 UT 37, ¶ 18, 212 P.3d 535. Our description of the facts also reflects this principle.

¶7     In October 2018, incorporation proponents submitted a feasibility study request to the Lieutenant Governor. This included a proposed map of Erda and signatures from property owners in the proposed incorporation area. The Lieutenant Governor asked the proponents to make certain boundary adjustments, amend the map, and gather additional signatures.

¶8     Appellants then met with various Erda property owners. Mathews met with John and Mark Bleazard and showed them the amended map. That map included land referred to as the "Six Mile property," which the Bleazards, among others, owned. The Bleazards signed the feasibility study request in late December 2018. Sorensen met with Judy Warr, who also owned property included in the amended map, and she, too, signed the feasibility study request.

¶9     The incorporation sponsors submitted the amended map, with the additional signatures, in January 2019. Between January and August 2019, the Lieutenant Governor's office sought to verify that the signatories had signed on behalf of their respective ranch properties, as the amended map depicted. The Lieutenant Governor's office made multiple efforts to confirm that with the Bleazards. In August 2019, the Lieutenant Governor's office certified the request for a feasibility study.

¶10 By February 2020, the feasibility study had been completed, allowing proponents to proceed with the incorporation ballot measure. In November 2020, voters approved Erda's incorporation.

*Six Mile Ranch Company Lawsuits and Community Discussion*

¶11   Shortly after the ballot measure passed, the Six Mile Ranch Company (Six Mile) filed a lawsuit challenging Erda's incorporation. The lawsuit named multiple individuals as defendants, including Appellants. The complaint alleged that one or more of the defendants had fraudulently modified the feasibility study request to make it appear as if the Bleazards signed on behalf of the Six Mile property instead of as individual property owners.

4

¶12 Someone uploaded a copy of Six Mile's complaint to a community Facebook group called "Erda Neighbors." Another person commented that Six Mile's lawsuit was baseless.[3]

¶13 Higgins, an Erda resident and relative of the Bleazards, responded to that post. In December 2020, she wrote that "the same people who committed/participated in the fraudulent actions referred to in this complaint are the same people who will be deciding the formation of an Erda City government & voting districts." She continued that "it looks like Incorporation Sponsors literally used & benefited [sic] from my relatives' property by doctoring a signature page so they could make the required land mass necessary for the feasibility study to even take place."[4]

¶14 In December 2021, Ron Hatfield, Nielsen's business partner, posted a link in Erda Neighbors to a change.org petition that he had created to stop "a group of really bad people." Hatfield wrote that he "and a group of landowners . . . want these mean people to quit their illegal maneuvering and under-the-table activity. With this petition we want the Lt. Governor to NOT

---

[3] Six Mile's first lawsuit was dismissed at some point after December 2020 but before November 2021. The case appears to have been dismissed on jurisdictional grounds.

[4] Appellants challenged Higgins's December 2020 statements as defamatory in their complaint but appear to concede on appeal that these statements fall outside the statute of limitations. On appeal, Higgins does not argue that to the extent Appellants' defamation claim against her is based on these statements, the claim should be dismissed on statute of limitations grounds, nor did she make that argument in her motion to dismiss. But in the hearing on her motion, Higgins's counsel noted to the district court that because Higgins's December 2020 statements were made "[m]ore than two years prior to the complaint," the court could not consider them in light of the "one-year statute of limitations." *See* UTAH CODE § 78B-2-302(4) ("An action may be brought within one year: . . . for libel, slander, false imprisonment, or seduction . . . ."); *see also Jensen v. Sawyers*, 2005 UT 81, ¶ 33 & n.6, 130 P.3d 325 (concluding that the one-year limitations period for libel and slander actions applies to defamation actions). For purposes of this appeal, we assume that the one-year statute of limitations bars any claims premised on Higgins's December 2020 statements.

OVERLOOK their illegal acts and hold them to the law . . . . The whole city is divided by these nut cases."[5]

¶15   In the online petition's comments section, Nielsen, an Erda property owner, wrote that "[t]he Erda sponsors committed fraud which was well documented and part of lawsuits against the Lieutenant Governor's office because the former director of elections was pushed into accepting those doctored documents, which he had told them were not acceptable."

¶16   That same month, Higgins, Nielsen, and McCown, also an Erda resident, made additional statements about Six Mile's lawsuit and Erda's incorporation. In the Erda Neighbors group, for example, Nielsen posted a link to Six Mile's first complaint with instruction to "[r]ead about the well documented fraud here."

¶17   In a different Facebook group, "Erda City 411," McCown posted an email he sent to the Utah State Elections Office, in which he stated that sponsors did a "pen and ink alteration"—a "forgery and a fraud in the opinion of a large portion of the population of the area." And Higgins posted the following in Erda Neighbors:

> Six Mile did not sign for the feasibility study. Two owners signed under the pretense—told to them by the sponsors—that they were signing for their individually owned properties in East Erda. Not for Six Mile Ranch properties. You can look up their affidavits if you'd like their full testimonies . . . the suit was dismissed because the election had already happened & because the plaintiffs filed as an incorporation & not as individuals. The dismissal does not negate the sworn affidavits submitted by the landowners stating the misuse of their signatures & property used by the sponsors to dilute the tax vs land mass ratio required to incorporate.

¶18   McCown then sent letters to some Erda residents, in which he requested their support for a petition to dissolve Erda. The letters directed readers to his website: free-erda.com. In the letters, McCown also stated that the ECA

> is the group behind all of the referendums and some of the lawsuits that have created severe division and

---

[5] Appellants do not base their claims on Hatfield's statements.

strife in our community. They are the reason we do not have a temple in Erda . . . . The same group, by and large, were also the sponsors of the City of Erda campaign. Their stated goals were simply to control the zoning of Erda . . . In my heart, if all of the electorate knew of the rulebreaking, fraud and forgery that went into the feasibility study, there is no way it would have passed.

¶19 In February 2022, the month after Erda received its certificate of incorporation, Six Mile filed a second lawsuit against several people, including Appellants. This lawsuit prompted additional online discussion. McCown, for example, made several statements about the case in Erda City 411. He said that he was "[g]lad to see all the fraud and lies get a chance to be prosecuted at a fair hearing." He also wrote that "[t]here is plenty of PROOF from ECA folk that they lie" and remarked that the "creation of a city based on lies, fraud, misrepresentation, [and] forgery is a WOW."

¶20 Over the next few months, McCown continued commenting on Six Mile's cases. At a Tooele County Council special meeting, during which the Council discussed Erda-related matters, McCown stated that:

It is no secret I am trying to organize enough people to dissolve the City of Erda. . . . With the fraud committed during the feasibility study—I consider it is a criminal thing that happened to us that wasn't well known to the citizens of Erda. I don't think that it would ever have passed if all the citizens knew all of the things that happened—from the map to the Six Mile Ranch pen and ink fraudulent markings up of the document.

¶21 He also posted in a Facebook group called "Erda Republic of America" about the "sponsors[']" and the "ECA['s] . . . involve[ment] in forgery." In his post, he referred to the incorporation sponsors and those affiliated with the ECA as "forgers, fraudsters, and felons."

¶22 McCown, in March 2022, accused Sorensen of "altering a document after it was signed and then fraudulently submitting it to a government agency." That same month, Higgins commented on that post, writing, "[The ECA] has egregiously defrauded the entire community with its gross double standards. Everything

7

they've said about protecting rural life and water resources is a lie." She added that the ECA was "defrauding cattle ranchers."

¶23 Under one of McCown's posts in Erda Republic of America about the feasibility study, Nielsen commented that "[t]he courts need to hear this in detail, complete with all necessary witnesses. There are significant harms which have resulted from this outrageous and well-documented fraud."

¶24 Six Mile then filed a third lawsuit against Appellants, in addition to other defendants, again asserting fraud allegations. Shortly after the case was filed, McCown posted a copy of the complaint in Erda Republic of America with the accompanying text: "the best April Fools Joke Ever!!!" Higgins responded to McCown's post, adding that "[a] more appropriate title for the post is Best April Fraud Joke Ever."

¶25 Appellees continued making statements about the lawsuits throughout 2022. McCown maintained his fraud accusations against the ECA and the incorporation sponsors, referring to them as "crooks." At an Erda City Council meeting, McCown accused the City Attorney of "being a criminal conspirator with [a councilman] and the ECA of crimes against the city and the city council."

¶26 Around that time, in response to one of McCown's posts in Erda Republic of America, Nielsen wrote that "[f]ortunately, the fraud is very well documented . . . and there is a judge who follows the law. Our attorneys are pleased with the situation. There is more which has happened too, which must come to light." Higgins also stated that it was "a shame city sponsors defrauded and frivolously sued landowners instead of working with them."

*District Court Proceedings*

¶27 Appellants sued Appellees, asserting claims for defamation and false light against each defendant. Appellants alleged that Appellees' statements were false. Appellants also alleged that they had "been damaged by the[] false and defamatory statements, because the statements subject [Appellants] to hatred, ridicule, contempt, and disgrace."

¶28 Higgins and Nielsen each moved under rule 12(b)(6) of the Utah Rules of Civil Procedure to dismiss the complaint for failure to state a claim. They both argued that Appellants failed to plead that they made their alleged statements with the requisite degree of fault, that their statements were incapable of defamatory

meaning, that their statements were opinions, that their statements were privileged, and that Appellants failed to plead all elements required to sustain their false light claims.

¶29 McCown also sought dismissal of Appellants' claims but on a different ground. He filed a motion for judgment on the pleadings under rule 12(c) of the Utah Rules of Civil Procedure based on Utah's Anti-SLAPP Act.[6] McCown asserted that the Anti-SLAPP Act protected him from Appellants' claims. He argued that he made his statements while participating in the "process of government," and that Appellants filed their complaint primarily to harass him.

¶30 The district court granted the motions, dismissing all claims with prejudice. On Higgins's and Nielsen's motions to dismiss, the court concluded that the "statements were made in the context of a public debate regarding the incorporation of Erda" and "that even if a *per se* defamation statement were triggered, the inquiry under the 12(b)(6) motion comes down to whether or not the . . . statements [were] capable of conveying a defamatory meaning." "[B]ased on the content and context of the pertinent statements," the court held that Higgins's and Nielsen's statements were not capable of defamatory meaning. The court also concluded that the pertinent statements were "privileged under the Utah public-interest privilege, fair-report privilege, and fair comment privilege." The court then ruled that Appellants failed to state claims for false light against Higgins and Nielsen for the same reasons the defamation claims sputtered.

¶31 With respect to McCown's motion, the court concluded that "McCown was participating in [the] process of government based on the content and context in which [his] statements were made" and "that the purpose of [Appellants'] complaint was to prevent, interfere with, or chill public participation in the process of government." The court relied on an affidavit McCown submitted with his motion to support its conclusions, in which he said, among other things, that he has been "heavily involved in local political issues," including "the incorporation of Erda."

---

[6] McCown also asserted an Anti-SLAPP Act counterclaim against Appellants, who moved to dismiss it. But because of the district court's rulings on Appellees' motions, *see infra* ¶¶ 30–32, the court denied Appellants' motion as moot.

¶32   The court also noted that it incorporated and adopted the reasoning Appellees included in their briefing and at oral argument.

## ISSUES AND STANDARDS OF REVIEW

¶33   Appellants contend that the district court erred when it granted Higgins's and Nielsen's motions to dismiss for failure to state a claim and McCown's motion for judgment on the pleadings. We review whether the court properly granted these motions "for correctness, giving no deference to the district court's determination[s]." *See Christiansen v. Harrison W. Constr. Corp.*, 2021 UT 65, ¶ 10, 500 P.3d 825 (motion to dismiss); *see also Golding v. Ashley Cent. Irrigation Co.*, 793 P.2d 897, 898 (Utah 1990) (motion for judgment on the pleadings).

## ANALYSIS

¶34   This case presents two sets of issues. The first arises out of the district court's grant of Higgins's and Nielsen's motions to dismiss. The second flows from the court's grant of McCown's motion for judgment on the pleadings.

¶35   Appellants argue that the district court erred when it granted the motions to dismiss. They claim that the district court erroneously concluded that (1) Higgins's and Nielsen's statements were not capable of defamatory meaning; (2) Higgins's and Nielsen's statements were privileged; and (3) Appellants' complaint failed to state claims for false light against Higgins and Nielsen.

¶36 Higgins and Nielsen assert that we should affirm dismissal of the defamation claims for two additional reasons. They first argue that the group defamation rule defeats the claims. And they assert that Appellants failed to plead that they made their statements with the requisite degree of fault.

¶37   Appellants also contend that the district court erred when it held that the Anti-SLAPP Act shields McCown from liability. They argue that the district court wrongly decided that McCown's speech amounted to participation in the process of government. They also assert that the district court lacked a basis to conclude that the purpose of Appellants' complaint was to prevent or chill McCown's public participation in the process of government.

I. THE DISTRICT COURT ERRED WHEN IT DISMISSED APPELLANTS'
   DEFAMATION CLAIMS

¶38  The district court granted Higgins's and Nielsen's motions to dismiss Appellants' defamation claims. The district court ruled that Higgins's and Nielsen's statements were not capable of defamatory meaning based on their "content and context." It also determined that the statements were privileged.

¶39  To state a defamation claim, a plaintiff must allege that the defendant published statements that referred to the plaintiff, that the statements were false and defamatory, that the statements were published with the requisite degree of fault, and that the publication of the statements resulted in damage.[7] *See West v. Thomson Newspapers*, 872 P.2d 999, 1007–08 (Utah 1994); *Wayment v. Clear Channel Broad., Inc.*, 2005 UT 25, ¶ 18 n.2, 116 P.3d 271.

¶40  When we review the grant of a motion to dismiss, "our inquiry is concerned solely with the sufficiency of the pleadings." *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 8, 104 P.3d 1226 (cleaned up). "A district court should grant a motion to dismiss only when, assuming the truth of the allegations in the complaint and drawing all reasonable inferences therefrom in the light most favorable to the plaintiff, it is clear that the plaintiff is not entitled to relief." *Phillips v. Henderson*, 2024 UT 19, ¶ 13, 552 P.3d 195 (cleaned up).

¶41  We note, however, that this general rule shifts when a court reviews a motion to dismiss a defamation claim. To "accommodate the respect we accord [constitutional] protections of speech," we do not "indulge [a plaintiff] by interpreting inferences that may be reasonably drawn from the statements in favor of a defamatory meaning." *Jacob v. Bezzant*, 2009 UT 37, ¶ 18, 212 P.3d 535 (cleaned up). "[W]e cede no discretion to the district court's view" of "[w]hether a statement is susceptible to a defamatory interpretation."[8] *Id.*

---

[7] In some circumstances, to prevail on a defamation claim, a plaintiff may also have to show that the defamatory statements were not protected by a privilege. That, however, is not part of a plaintiff's initial pleading burden. *See infra* Part I.C.

[8] Higgins argues that because this is a defamation case, Appellants are not entitled to any "favorable interpretation of

(continued . . .)

*A. The District Court Erred When It Held that Appellants Had Not Pleaded a Statement Capable of Conveying a Defamatory Meaning*

¶42 The district court granted the motions to dismiss because it concluded that Higgins's and Nielsen's statements were not capable of defamatory meaning.[9] The district court based this ruling on the "content and context" of the statements Appellants alleged were defamatory. The district court did not detail what about the statements' content and context informed its conclusion. Instead, the court summarily "incorporate[d] and adopt[ed] the reasoning made by the Defendants in their briefing and oral arguments." This puts Appellants in the unenviable position of arguing on appeal that none of the arguments Higgins and Nielsen offered below hold water, even if one or more of those arguments did not form the basis of the district court's conclusion.[10]

---

factual inferences"—full stop. But our precedent merely dictates that we do not "interpret[] inferences that may be reasonably drawn from the statements *in favor of a defamatory meaning.*" *Jacob*, 2009 UT 37, ¶ 18 (emphasis added). And as discussed below, we adhere to that same standard when determining whether statements are opinions. *See infra* ¶ 98.

[9] To resolve this appeal, at least against Higgins and Nielsen, we need only conclude that Appellants alleged at least one statement that is capable of a defamatory meaning. When we analyze Appellants' arguments, we identify at least one statement for each Appellee that can survive a motion to dismiss. We do not, however, parse each quoted statement in the complaint to separate out the entire universe of statements that might sustain a defamation claim. We stress that we offer no opinion on any statement that we do not explicitly address.

[10] We pause to comment on the district court's order. It is not helpful to either the parties or an appellate court for a trial court to include language like the court "incorporates and adopts the reasoning made by the Defendants in their briefing and oral arguments" in its dismissal order. This may require parties to brief issues that the district court did not find compelling enough to include in its own analysis. And it requires an appellate court to assume that the district court adopted all the arguments in the underlying briefing and in-court presentation, without any insight

(continued . . .)

¶43 Before the district court, Higgins and Nielsen emphasized three details that, in their view, supported their argument that the statements Appellants included in the complaint were not capable of conveying defamatory meaning. First, the statements were made on social media. Second, the statements related to a matter of public debate. And third, the statements concerned allegations asserted in lawsuits.

¶44 To begin, the district court got it right when it evaluated the complaint to see if Appellants had alleged statements that are capable of defamatory meaning. *See West*, 872 P.2d at 1008; *see also SIRQ, Inc. v. Layton Cos.*, 2016 UT 30, ¶¶ 40–41, 379 P.3d 1237 (explaining the court's "gatekeeping function" of assuring that only statements capable of defamatory meaning are considered by a jury). If a court reviewing a motion to dismiss concludes that a plaintiff has not alleged a statement that is capable of a defamatory meaning, the court must dismiss the defamation claim. *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1988); 3 DAN B. DOBBS, PAUL T. HAYDEN & ELLEN M. BUBLICK, THE LAW OF TORTS § 526 (2d ed. 2011) [hereinafter THE LAW OF TORTS].

¶45 "The meaning of words . . . is critical not only on the issue of defamatory quality but also on the issue of truth or falsity, even though those issues are distinct from one another." THE LAW OF TORTS § 526. On a motion to dismiss, the question for the district court is whether the pleaded statements are capable of defamatory meaning. If the court concludes that a reasonable person could find that a statement conveys a defamatory meaning, the plaintiff has done what she needs to do at the pleading stage on the capable of defamatory meaning element of her claim. *See id.*; *West*, 872 P.2d at 1008. In that instance, the trier of fact ultimately decides what meaning the words conveyed and whether that meaning was defamatory. THE LAW OF TORTS § 526; *see West*, 872 P.2d at 1008 ("If the court determines that the statement is capable of sustaining such a meaning as a matter of law, the trier of fact must then determine whether the statement was in fact so understood by its audience.").

---

into why the district court thought the arguments were persuasive or even whether the court did indeed find all the arguments to be persuasive. While we certainly understand the instinct to be overinclusive, we cannot condone this approach to satisfy that instinct.

¶46 In Utah, a statement is defamatory if "it impeaches an individual's honesty, integrity, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *West*, 872 P.2d at 1008. A "publication is not defamatory simply because it is nettlesome or embarrassing to a plaintiff, or even because it makes a false statement about the plaintiff." *Id.* at 1009 (cleaned up). The plaintiff must show the statement's tendency to injure his reputation in the eyes of "at least a substantial and respectable minority of its audience." *Id.*; *see also id.* at 1009 n.16 (stating that the "relevant audience does not consist solely of the plaintiff"). For a statement to be capable of defamatory meaning, the statement must be able to be understood as speaking to a person's character in a way that puts the person at risk of "public hatred, contempt, or ridicule." *Id.* at 1008.

¶47 "A court simply cannot determine whether a statement is capable of sustaining a defamatory meaning by viewing individual words in isolation; rather, it must carefully examine the context in which the statement was made, giving the words their most common and accepted meaning." *Id.* at 1009.

¶48 *West* demonstrates this principle in practice. There, the mayor of La Verkin, Utah, Terry R. West, sued Thomson Newspapers (dba *The Daily Spectrum*) and three of its employees for defamation. *See id.* at 1000–01. West alleged that *The Daily Spectrum* defamed him in a series of three editorial columns. The columns criticized him for changing his political position on an important local issue and for attempting to "manipulate the press." *Id.* at 1000.

¶49 In the June column, published on *The Daily Spectrum*'s weekly editorial page, reporter Rick Guldan criticized West for changing his position on whether La Verkin should purchase a municipal power system. *Id.* at 1000–01. After West met with the paper's publisher, Donald Hogun, *The Daily Spectrum* published a letter West wrote to the editor, "in which he refuted, point by point, the criticisms leveled in the June column," on the paper's op-ed page. *Id.* at 1001–02.

¶50 In the July column, Guldan responded to the issues raised in West's letter. *Id.* at 1002. Guldan wrote, "I said Mayor West had been opposed to municipal power during the election. The mayor claims he never took that position. Several La Verkin citizens[,] however, have told me that prior to the election they were under the impression West was opposed to municipal power . . . ." *Id.* He

continued, saying, "If West never actually came out before the election and said he was opposed to municipal power, he certainly did a masterful job of creating an illusion he was." *Id.*

¶51 That November, Brent Goodey, *The Daily Spectrum*'s managing editor, published a column in the paper's editorial page: "How I came to 'love' La Verkin's mayor" (November column). *Id.* Goodey described how West and Phil Phillips, the La Verkin planning commission chairman, "had responded to, and attempted to influence, stories printed in" the newspaper. *Id.* In summarizing West's and Phillips's actions, Goodey said, "The problem I have with the two gentlemen is their repeated, and not to [sic] subtle, attempts to manipulate the press." *Id.*

¶52 West sued *The Daily Spectrum*, Guldan, Hogun, and Goodey based upon statements in the June, July, and November columns. *Id.* West claimed that "the assertion that [he] changed his position on municipal power" was defamatory. *Id.* West also claimed that republishing the change-of-position statement in the July column defamed him. *Id.* West did not claim that the change-of-position statements were defamatory on their face. *Id.* at 1011. Rather, the "implication arising from the statement[s] and the context in which [they were] made . . . form[ed] the basis of West's claim." *Id.* "West [also] sued Goodey and Hogun for the manipulation statement in the November column." *Id.* at 1002.

¶53 The district court dismissed most of West's claims. It first dismissed the claim premised on the November column, finding that the statement was not capable of a defamatory meaning. *Id.* Although the court found that the implication arising from the change-of-position statements was capable of such a meaning, the court dismissed the claims arising from the change-of-position statements because they were protected opinions. *Id.* at 1002–03, 1011. West appealed, and the court of appeals "reversed all of the trial court's rulings with the exception of the claims against Hogun and Goodey arising from the . . . change-of-position statement[s]." *Id.* at 1003. We granted defendants' petition for certiorari. *Id.*

¶54 We held that the statement from the November column—that West manipulated the press—was not capable of a defamatory meaning. We found it significant that the statement "appeared in a newspaper editorial, a traditional source of harsh political invective." *Id.* at 1009. We explained that "[n]ewspaper readers expect that statements in editorials will be more exaggerated and polemicized than 'hard news.'" *Id.* "Readers are therefore less

likely to form personal animus toward an individual based on statements made in an editorial," and they "likewise expect to see public officials criticized in editorial writing and are therefore less likely to rely on it in forming their opinions of the official." *Id.* at 1009–10. Goodey also made the statement in "a casual, albeit critical, tone," such that it was "unlikely that any reader would take it at face value." *Id.* at 1010. Indeed, "most readers would view it as exaggerated commentary," a speech category other courts have not found as defamatory. *Id.* (citing cases). "[T]he most that [could] be said of the manipulation statement [was] that it criticized West," and "[s]uch criticism is not defamatory."[11] *Id.*

¶55 Much like the court in *West*, the district court here reviewed Appellants' complaint to see if it could find any statements capable of conveying defamatory meaning. But the district court did not show its math and summarily concluded that, based on the "content and context" of (apparently all) the statements, none could sustain a defamation claim. Appellants argue that the district court got it wrong to the extent that the "content and context" were Appellees' arguments that "the statements were made on social media," "the statements related to a matter of public debate," and "the statements concern the allegations in a lawsuit." Appellants contend that a reasonable person would conclude that the statements were capable of defamatory meaning, even if they were made on social media, were matters of public debate, and were related to litigation.

¶56 Higgins argued that "[t]he comments identified in the complaint reflect that [she] was engaged in a hotly debated public controversy in a local Erda Facebook group." She had also "relayed allegations from several lawsuits, and offered her opinion based upon those allegations." Given that context, Higgins contended it was unlikely that readers would take her statements at face value and, therefore, they were not capable of defamatory meaning. She argued that "when a Facebook user views a Facebook thread with people arguing different sides of a debated issue, the user

---

[11] The defendants did not appeal the determination that the implication arising from the change-of-position statements was capable of a defamatory meaning. *West*, 872 P.2d at 1011. Our analysis therefore assumed that the implication was capable of such a meaning. *Id.*

understands that both participants are offering subjective arguments."

¶57 Nielsen, too, highlighted that his statements "were published in the context of a contentious debate over the propriety of the Erda incorporation and the related litigation" and were "made either as a comment to a change.org petition or on a Facebook page where people were debating a heated public matter." Given this context, Nielsen argued that "none of [his] alleged statements [were] capable of conveying defamatory meaning."

¶58 To determine whether a statement is capable of sustaining a defamatory meaning, a court does not view "individual words in isolation; rather, it must carefully examine the context in which the statement was made." *Id.* at 1009. Before we analyze the full context of Higgins's and Nielsen's statements, however, we believe it useful to review the three features of the statements that Appellants contend may have been—alone or together—the "content and context" the district court referred to. These are (1) the statements were made on social media; (2) the statements related to a matter of public debate; and (3) the statements concerned allegations asserted in lawsuits.

### 1. Social Media

¶59 Higgins and Nielsen argued to the district court that a reasonable reader viewing a Facebook thread, for example, would not take statements individuals posted there at face value. That context, according to Higgins and Nielsen, lends support for the conclusion that statements made on Facebook, or on other social media platforms, are not capable of defamatory meaning. Stated more bluntly, and more generally, than Higgins and Nielsen articulate their arguments, they contend something akin to the proposition that everybody understands that social media posts are full of half-truths and exaggerated claims, so it is difficult, if not near impossible, for a social media post to give rise to a successful defamation claim.

¶60 A "statement's publication on social media does not automatically" immunize the publisher from a defamation action. *Bauer v. Brinkman*, 958 N.W.2d 194, 200 (Iowa 2021). Indeed, other courts have concluded that statements made on social media are capable of defamatory meaning. *See, e.g.*, *Watson v. NY Doe 1*, 439 F. Supp. 3d 152, 162 (S.D.N.Y. 2020) (denying motion to dismiss defamation claim because a defendant's Facebook comments "can

reasonably be read to suggest that [the defendant] intended to endorse the alleged defamatory statement"); *Khalil v. Fox Corp.*, 630 F. Supp. 3d 568, 580 (S.D.N.Y. 2022) (holding that the context of social media posts formerly known as tweets, among other statements, "confirm[ed] the defamatory nature of the[] statements"); *Lewis v. Abramson*, 673 F. Supp. 3d 72, 96–97 (D.N.H. 2023) (determining that a statement made online was capable of a defamatory meaning).

¶61 "Many people [today] rely on social media as a source of factual information." *Bauer*, 958 N.W.2d at 200 ("In 2020 fifty-three percent of U.S. adults reported getting news from social media often or sometimes." (cleaned up)); *see also* Elisa Shearer & Amy Mitchell, PEW RSCH. CTR., NEWS USE ACROSS SOCIAL MEDIA PLATFORMS IN 2020 (2021). Facebook especially "stands out as [a] regular source of news for Americans." Shearer & Mitchell, *supra*, at 5. "[A]bout a third (36%) of Americans [get] news there regularly." *Id.* For many users, Facebook is their "principal source[] for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *See Packingham v. North Carolina*, 582 U.S. 98, 104, 107 (2017).

¶62 Given this, a per se rule that statements made on social media are incapable of defamatory meaning would be inappropriate. But we do have some sympathy for the district court. Deciding whether a particular statement posted to a certain social media platform is capable of a defamatory meaning can seem daunting, especially at the pleading stage. Social media, after all, creates problems for "laws that govern various wrongs, including . . . defamation[] . . . because they were drafted at [or before] the advent of the digital era and not with social media in mind." *See* Heidi Frostestad Kuehl, *Free Speech and Defamation in an Era of Social Media: An Analysis of Federal and Illinois Norms in the Context of Anonymous Online Defamers*, 36 N. ILL. U. L. REV. 28, 32 (2016).

¶63 *West* provides a perfect example of this. We decided that case in 1994, about ten years before Facebook arrived on the scene. *See id.* (explaining that Facebook emerged in 2004 and that most "social media websites were born after 2000"). The newspaper we analyzed in *West* had a clear demarcation between its news and editorial pages. 872 P.2d at 1000–01, 1009–10. This allowed us to be categorical when we looked at the allegedly defamatory statements. We could write, with some confidence, things like,

"Newspaper readers expect that statements in editorials will be more exaggerated and polemicized than 'hard news'" and that readers "expect to see public officials criticized in editorial writing and are therefore less likely to rely on it in forming their opinions of the official." *Id.* at 1009–10. But even in that seemingly simplified media environment, we eschewed bright line rules and acknowledged that "statements about public figures in newspaper editorials are not incapable of being defamatory." *Id.* at 1010.

¶64 *West* remains good law, and the rationale underlying the contextual analysis *West* mandates is even stronger when we consider modern social media trends. The district court must "carefully examine the context in which [a] statement was made, giving the words their most common and accepted meaning," to determine whether the statement is capable of a defamatory meaning. *Id.* at 1009.

¶65 To the extent the district court held that because Higgins and Nielsen made their statements on social media, the statements were categorically incapable of defamatory meaning, it erred. Just as "[a] court simply cannot determine whether a statement is capable of sustaining a defamatory meaning by viewing individual words in isolation," *id.*, a court cannot conclude that a statement is incapable of a defamatory meaning merely because a defendant made it on social media. In at least some circumstances, a plaintiff could show that social media posts are capable of defamatory meaning.

### 2. Public Debate

¶66 During the hearing on the motions to dismiss, the district court explained that it granted Higgins's and Nielsen's motions in part because the statements were made in the context of "a public debate . . . in which opinions were being expressed about disagreements regarding the incorporation or disincorporation of Erda." And "when you look at [that] context," the court continued, the statements are incapable of conveying defamatory meaning.

¶67 Appellants contend that "[e]ven if the incorporation status of Erda is a continued matter of public concern," and even if the statements took place within the context of a public debate, that does not automatically "compel the conclusion that the statements [are] not susceptible of conveying defamatory meaning."

¶68 We have never held that speech related to a matter of public concern, made within the context of a public debate, can

*never* be capable of defamatory meaning. In *Russell v. Thomson Newspapers, Inc.*, we examined allegations of "misconduct against a local doctor and nurse." 842 P.2d 896, 902–03 (Utah 1992). We concluded that they were "certainly matters of public concern," but we reversed the dismissal of the plaintiff's defamation claims because the statement was "not protected under the fair comment doctrine." *Id.* We did not opine on whether statements involving "matters of public concern" are capable of defamatory meaning. *See generally id.*

¶69  Appellees rely on a court of appeals case in which the court held that particular statements regarding matters of public importance could not sustain a defamation claim. *See Pipkin v. Acumen*, 2020 UT App 111, 472 P.3d 315. There, the plaintiffs were former members of the State Central Committee (SCC), the governing body of the Utah Republican Party (URP). *Id.* ¶ 1. In 2014, the Legislature "passed SB54 which, when enacted, created a signature-gathering path for candidates to the primary election ballot as an alternative to state nominating conventions and prevented any political party from restricting access to its primary ballot solely to candidates who won nomination through the convention process." *Id.* ¶ 2. The URP opposed SB54. *Id.* "[A]fter the URP lost two lawsuits challenging SB54's signature provision," the SCC adopted a controversial bylaw. *Id.* ¶¶ 1, 3. The defendant, who opposed the bylaw, sent emails to URP members and posted on social media criticizing the bylaw and challenging its legality. *See id.* ¶ 1. In these statements, the defendant also alleged that the plaintiffs either supported the bylaw or voted in its favor. *Id.* The plaintiffs sued for defamation. *Id.*

¶70  The defendant allegedly accused the plaintiffs of "acting criminally for *voting* for the Bylaw." *Id.* ¶ 17. For instance, the defendant sent an email in which he stated that the plaintiffs' "actions or stunt flouts current election law, it constitutes a class B misdemeanor under section 20A of Utah State Code, punishable by up to six (6) months in jail and a $1,000 fine." *Id.* (cleaned up). In a social media post, he also stated, "If you want to, let the #GangOf51 know how you feel about their illegal activity."[12] *Id.*

---

[12] The defendant referred to a "Gang of 51." *Pipkin*, 2020 UT App 111, ¶ 5. The court of appeals explained that "[t]he origin of the phrase [was] not entirely clear from the record." *Id.* ¶ 5 n.6.

(continued . . .)

¶71 The court of appeals held that the allegedly defamatory statements—which it regarded as "unquestionably political speech"—were "not susceptible to defamatory interpretation[s] as a matter of law." *Id.* ¶¶ 18, 24. But notably, the court did not say that political speech, made in the context of a public debate, could never be capable of defamatory meaning. *See generally id.* ¶¶ 18–21, 24. Instead, the court held that the specific statements at issue were not susceptible to defamatory interpretations based on their context—that is, a reasonable reader of the statements "would have been aware that the challenged statements were a continuation of" a particular debate, and the defendant "sent the emails in the familiar format of a political email, similar to those that political candidates or parties send attacking their opponents and seeking contributions." *See id.* ¶¶ 18–21.

¶72 To the extent *Pipkin* can be read as saying that unquestionably political speech can never be capable of defamatory meaning, that is incorrect. Even if we concluded that Higgins's and Nielsen's statements are "unquestionably political speech," *id.* ¶ 18, or that they were made in the context of a public debate, that does not end the inquiry. A reasonable reader could find such statements to be capable of defamatory meaning.

¶73 The parties also dispute the extent to which *Jacob*, 2009 UT 37, supports the proposition that statements related to a matter of public concern, made within the context of a public debate, can be capable of defamatory meaning.

¶74 In that case, William Jacob challenged as defamatory statements in an "Election Notice," issued in response to a political advertisement Jacob prepared and paid for in a local weekly newspaper. *Id.* ¶¶ 3–4. The advertisement did not contain Jacob's name, and it weighed in on a local controversy: whether certain individuals could hold office as city council members because they were city employees. *Id.* The Election Notice, on the other hand, disclosed Jacob's identity as the author of the advertisement and contained apologies to the individuals mentioned in Jacob's advertisement. *Id.* ¶ 4. We held that, when viewed in context, the Election Notice did not convey a defamatory meaning. *See id.* ¶ 18. We reasoned that the statements "came within a heated political campaign," and Jacob conceded that the Election Notice was an

---

Regardless, the defendant "numbered [p]laintiffs among the members of the 'Gang of 51.'" *Id.*

editorial. *Id.* ¶ 30. "As a result, we [did] not find that the words used . . . in [the] Election Notice constitute[d] defamation as a matter of law." *Id.* Importantly, however, we did not say that statements coming "within a heated political campaign" could never be capable of defamatory meaning. *See id.* ¶¶ 30–31. There may be some contexts in which statements made "within a heated political campaign" are capable of defamatory meaning; the speech at issue in *Jacob* just did not present one of them.

¶75 Still, Higgins argues that "[s]peech relating to matters of public concern receive[s] even higher protection." (Citing *Keisel v. Westbrook*, 2023 UT App 163, ¶ 36, 542 P.3d 536.) The first problem for Higgins is that in *Keisel*, the court of appeals was discussing the distinction between factual statements and opinion statements, rather than whether the statements at issue were capable of defamatory meaning. *See id.* ¶¶ 25, 32. The next is that Higgins's characterization of that case does not quite align with what *Keisel* says. There, the court of appeals explained that "a plaintiff is definitionally unable to satisfy th[e] falsity element [of defamation] with regard to statements of pure opinion, because such statements are incapable of being verified and therefore cannot serve as the basis for defamation liability." *Id.* ¶ 36 (cleaned up). The court continued, explaining that the "First Amendment to the United States Constitution . . . protects *statements of opinion*, and this protection is even more pronounced in matters of public concern." *Id.* (emphasis added).

¶76 Nielsen adds another case to the mix: *Nunes v. Rushton*, 299 F. Supp. 3d 1216 (D. Utah 2018). Even if the federal district court's interpretation of Utah law were binding on this court, *Nunes* would not help Nielsen. There, Nunes, a writer who had authored more than fifty novels, sued Rushton, also a writer, for, inter alia, defamation. *Id.* at 1222, 1224. The defamation claim challenged statements Rushton made on "about fifteen 'sock puppet' accounts" across the internet, in which she made negative reviews of Nunes and her books.[13] *Id.* at 1222–23. One category of comments

---

[13] A "sock puppet" is "a false online name and profile created to hide the author's identity, usually because of personal, political or financial ties to whatever is being discussed or reviewed." *Behind every sockpuppet is a person trying to hide*, NEWS LITERACY PROJECT, https://newslit.org/tips-tools/news-lit-tip-sock-puppet/ (last visited Aug. 11, 2025).

included those "that characterize[d] Nunes's actions as either harassment or fraud." *Id.* at 1229 (cleaned up). Nielsen claims that the court did not find online accusations of fraud and harassment to be defamatory in part because "the statements were posted in the context of an online debate about an alleged copyright infringement and other inappropriate actions."

¶77 While the *Nunes* court considered the context of these statements, the court did not decide that the statements were not capable of defamatory meaning. *See id.* at 1231–32. The court instead evaluated the statements' context to determine whether they were opinions or factual assertions. *See id.* Moreover, although the court acknowledged that at least some of the statements were "posted in the context of a debate," that detail was not material to the court's analysis. *See id.* Rather, the court found it significant that "[t]he facts implied by" the statements "[were] not criminal, nor [were] they false or defamatory." *Id.* The court, as a result, held that the statements were opinions that could not support a defamation claim. *See id.*

¶78 Even assuming that Higgins's and Nielsen's statements were made within the context of a public debate, that, at bottom, does not necessarily immunize the statements.

### 3. Statements Describing Litigation

¶79 Nor is there any basis for us to conclude that statements describing allegations made in connection with litigation can never sustain defamatory meaning. To determine whether such statements are capable of defamatory meaning, a court must look at the statements in context, "giving the words their most common and accepted meaning." *See West*, 872 P.2d at 1009.[14] That a statement is made concerning litigation might be very helpful

---

[14] To be clear, Utah law recognizes a judicial proceeding privilege that protects certain statements "made during a judicial proceeding." *See Pratt v. Nelson*, 2007 UT 41, ¶ 27, 164 P.3d 366. That privilege can be waived by, among other things, excessive publication. *See, e.g., Debry v. Godbe*, 1999 UT 111, ¶ 21, 992 P.2d 979. It is helpful to separate the question of whether a statement made in connection with litigation can be capable of defamatory meaning from the question of whether an otherwise defamatory statement is subject to privilege.

context to understand how a reader would understand the comment, but it is not, by itself, dispositive.

### 4. Additional Content and Context

¶80  Appellants argue that the district court erred because the "content and context" the court referred to in its order demonstrate that the challenged statements are capable of defamatory meaning. Appellants assert that Higgins's and Nielsen's statements "are factual laden with no cautionary language or exaggeration" and that they made the statements in a "serious" tone. This, according to Appellants, helps demonstrate that the statements are capable of defamatory meaning.

¶81 We have looked at the substance of an allegedly defamatory statement, as well as the tone in which a defendant made it, to assess whether the statement was capable of a defamatory meaning. In *West*, we held that the statement accusing West of attempting to manipulate the press, 872 P.2d at 1002, was not capable of a defamatory meaning, in part, because it "was made in a casual, albeit critical, tone," such that "[i]t [was] unlikely that any reader would take it at face value," *id.* at 1010. "[I]nstead, most readers would view it as exaggerated commentary expressing Goodey's frustration in dealing with West." *Id.*

¶82 We went on to explain that "courts have found exaggerated editorial commentary not defamatory." *Id.* (citing cases). Other courts have reached similar results. In *Clifford v. Trump*, for example, the court held that one of President Donald J. Trump's tweets—"A sketch years later about a nonexistent man. A total con job, playing the Fake News Media for Fools (but they know it)!"—was rhetorical hyperbole because it "display[ed] an incredulous tone, suggesting that the content of his tweet was not meant to be understood as a literal statement." 339 F. Supp. 3d 915, 926 (C.D. Cal. 2018).

¶83  Here, Appellants pleaded at least one statement that, considering its content and tone, could be capable of defamatory meaning. In Higgins's March 2022 post, for example, she wrote in Erda Republic of America that "[The ECA] has egregiously defrauded the entire community with its gross double standards. Everything they've said about protecting rural life and water resources is a lie." She added that the ECA was "defrauding cattle ranchers."

¶84 And in Nielsen's first post, he declared that "[t]he Erda sponsors committed fraud" that was "well documented and part of lawsuits."

¶85 These statements lack rhetorical hyperbole, exaggeration, incredulous tones, cautionary language, or other signals that would lead a reasonable reader to not take the statements at face value. Rather, the statements conveyed more serious, matter-of-fact tones, suggesting that a reasonable reader could understand them as factual assertions about Appellants. We agree with Appellants that this supports a conclusion that these statements are capable of defamatory meaning.

¶86 Higgins argues otherwise, contending that her statements included "cautionary language and hyperbole." She asserts that "[s]he preface[d] that she is the daughter of the plaintiff in the other action." She also points to language such as, "I don't know the answers to the questions posed here" and "I am extremely frustrated." She maintains that these statements couched her other statements, and that this language is coupled with obvious examples of hyperbole, including "it is absolutely wrong," "it's quite obvious," and "egregiously."

¶87 Higgins's March 2022 post (the one just discussed) lacked much of this hedging. Although Higgins used the word "egregiously," whether the post is capable of defamatory meaning does not turn on the proposition that Appellants acted egregiously. That is, the problematic part of the post is not that "[The ECA] . . . egregiously" did anything; it is that Higgins stated, without any signal expressing doubt, that the ECA "*defrauded* the entire community" and "cattle ranchers." (Emphasis added.) While perhaps a reader is unlikely to take at face value that the ECA *egregiously* defrauded the community, we think that, based on the omission of any additional hedging and caution, a reader could understand Higgins's statements—that the ECA defrauded the entire community and cattle ranchers—as facts about Appellants. To be sure, we can envision circumstances in which including descriptors like "egregiously" might signal to a reader that a statement is hyperbole. Higgins's March 2022 statement is just not one that contains a signal so strong that a reader would necessarily understand that Higgins was attempting to communicate something other than facts about Appellants. Higgins is free to argue to the trier of fact that her statement did not defame Appellants, but Appellants have pleaded a statement that is

capable of defamatory meaning. As such, it was error to dismiss the defamation claim based on this statement.

¶88 Nielsen similarly argues that he made his statements at a time when "emotions were running high." As evidence, he notes that his statements can only be understood as expressions of his personal view on the "very-public controversy surrounding the incorporation of Erda." But as we explained, *see supra* ¶¶ 66–78, there are no per se rules about whether statements are capable of defamatory meaning in the context of a "very-public controversy." In any event, nothing about Nielsen's first post was emotionally charged. Rather, he stated that "[t]he Erda sponsors committed fraud which was well documented and part of lawsuits." Nielsen might be able to convince a jury that the relevant community would not have interpreted this as defamatory in light of the community's knowledge of the ongoing dispute, but he cannot successfully claim at the motion to dismiss stage that his accusation of fraud is not capable of a defamatory meaning.

¶89 Higgins and Nielsen also assert that their statements are not capable of defamatory meaning because they do not directly accuse Appellants of criminal conduct.[15]

¶90 We have held that, depending on the circumstances, accusations of dishonesty can be capable of a defamatory meaning. *See Prince v. Peterson*, 538 P.2d 1325, 1328 & n.4 (Utah 1975); *Combes*

---

[15] The parties also dispute whether any of the challenged statements amount to defamation per se, but we need not decide this because the question before us is whether the statements are capable of defamatory meaning. *See West*, 872 P.2d at 1008; *Cox*, 761 P.2d at 561. While we have recognized that some words are "of such common notoriety that the injury [to the plaintiff] can be presumed from the words alone," *Allred v. Cook*, 590 P.2d 318, 321 (Utah 1979), the legal significance of concluding that a plaintiff has alleged statements that are per se defamatory is that the plaintiff need not allege damages to sustain their claim, *see Seegmiller v. KSL, Inc.*, 626 P.2d 968, 977 n.7 (Utah 1981) (explaining that libel per se and defamation per se were actionable at common law without proof of special damages); *Baum v. Gillman*, 667 P.2d 41, 42 (Utah 1983) ("Inasmuch as the complaint contains no allegation of special damages, in order to state a claim upon which relief can be granted the statements attributed to [the defendant] must constitute defamation *per se*.").

*v. Montgomery Ward & Co.*, 228 P.2d 272, 274 (Utah 1951) (holding that "taking the circumstances all together, . . . [the statements] would impute dishonesty to the plaintiff and amount to slander per se"); *SIRQ*, 2016 UT 30, ¶ 53 & n.7 (concluding that the defendant's statement that the plaintiff was dishonest was "at least arguably capable of defamatory meaning"). Similarly, we have said that false statements alleging criminal conduct on the part of the plaintiff are defamatory per se, *see, e.g.*, *Larson v. SYSCO Corp.*, 767 P.2d 557, 560 (Utah 1989), and that assertions of "at least ethically improper conduct" could have a defamatory meaning under certain circumstances, *see West*, 872 P.2d at 1010–11. Here, viewing Higgins's and Nielsen's statements in context, a reasonable reader could find that Higgins and Nielsen accused Appellants of engaging in "at least ethically improper conduct." *See id.* It follows that the statements are capable of defamatory meaning.

¶91 We acknowledge that there are uses of the words "fraud" and "defraud" that do not necessarily denote criminal conduct. *Cf. Westmont Residential LLC v. Buttars*, 2014 UT App 291, ¶ 24, 340 P.3d 183 (holding that although "the term 'crooks' can carry a criminal connotation, . . . the term [was] clearly not being used in this manner"). But given the context of the statements, a reader could understand that Higgins and Nielsen accused Appellants of criminal activity. *See Fraud*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "fraud" as "[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment" and explaining that "[f]raud is [usually] a tort, but in some cases ([especially] when the conduct is willful) it may be a crime"); *see also Defraud*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "defraud" as "[t]o cause injury or loss to (a person or organization) by deceit; to trick (a person or organization) in order to get money" and referring users to the definition of "fraud"). This further bolsters our conclusion that the statements are capable of defamatory meaning.

¶92 Finally, we reject Higgins's and Nielsen's remaining arguments. They both contend that because most of their statements were made as comments or responses to other individuals, they are less likely to be capable of defamatory meaning. That appears to be a distinction without significance. At the very least, the assertion is not self-evident, and neither Higgins nor Nielsen has given us any authority for the proposition that responses to comments are incapable of defamatory meaning.

¶93 Higgins also emphasizes that her statements "appear[ed] in the type of public forum that ensures both parties are able to respond and engage in discussion." (Citing *Spencer v. Glover*, 2017 UT App 69, 397 P.3d 780.) Nielsen makes a similar argument about his first statement, contending that because it was "posted in the comments section of a change.org petition," it "would inherently signal to its readers" that it was not defamatory. But statements made on social media—regardless of the type of forum—are not automatically immunized. *See supra* ¶¶ 59–65. And, even considering the statements in the context in which they appeared, a reader could conclude that Higgins and Nielsen were asserting facts about Appellants.

¶94 Accordingly, Appellants have alleged enough to support the conclusion that a reasonable reader could find that at least one of Higgins's and Nielsen's statements is capable of a defamatory meaning.[16] *See West*, 872 P.2d at 1008–11 & n.16. The district court erred when it concluded that none of the challenged statements were capable of defamatory meaning and dismissed the complaint.

*B. The District Court Erred to the Extent It Held that Higgins's and Nielsen's Statements Are Opinions*

¶95 Higgins and Nielsen argued to the district court that their statements were opinions and therefore could not be the basis of Appellants' defamation claims. In its order, the district court did not dismiss Appellants' claims because they were opinions, at least explicitly. But the court "incorporate[d] and adopt[ed] the reasoning made by the Defendants in their briefing and oral arguments," leaving open the possibility that the court dismissed the claims on this ground. On appeal, the parties dispute whether Higgins's and Nielsen's statements are opinions and, accordingly, whether they can support Appellants' defamation claims.

¶96 In *West*, we recognized that the "Utah Constitution provides an independent source of protection for expressions of opinion," so long as they do not "state[] or impl[y] facts that are

---

[16] By way of reminder, the question for the court on a motion to dismiss is whether the statement is capable of defamatory meaning. *See West*, 872 P.2d at 1008. The court assesses this by asking whether a reasonable reader could find the statement to be defamatory. *See* THE LAW OF TORTS § 526. If the complaint survives the motion, the question of whether the statement actually defamed the plaintiff is one for the trier of fact. *See id.*; *see also West*, 872 P.2d at 1008.

false and defamatory." 872 P.2d at 1013, 1015 (explaining that "when [an] opinion states or implies facts that are false and defamatory," the opinion "protection is 'abused'"). That is "because expressions of pure opinion fuel the marketplace of ideas and because such expressions are incapable of being verified, they cannot serve as the basis for defamation liability." *Id.* at 1015. We apply four factors to help distinguish statements protected as opinions from statements of fact. *See id.* at 1018. These are (1) "the common usage or meaning of the words used"; (2) "whether the statement is capable of being objectively verified as true or false"; (3) "the full context of the statement—for example, the entire article or column—in which the defamatory statement is made"; and (4) "the broader setting in which the statement appears." *Id.* (citing *Ollman v. Evans*, 750 F.2d 970, 979 (D.C. Cir. 1984) (en banc)). Whether a statement is one of fact or opinion is a question of law for the court to decide. *See id.*

¶97 We take a moment to note some confusion in the briefing. The parties, at times, approach the *West* factors as a means to determine whether statements are capable of defamatory meaning. But whether statements are capable of defamatory meaning and whether statements are protected under our constitution as opinions are separate inquiries.[17] *Id.* at 1007–12. It can be important

---

[17] While we have never held that statements are not capable of defamatory meaning because they are opinions, or that statements are capable of defamatory meaning because they are facts, the court of appeals has held that statements were capable of defamatory meaning because, applying the four-factor test, "there [was] sufficient reason to find all of them to be statements of fact rather than opinion." *See RainFocus Inc. v. Cvent Inc.*, 2023 UT App 32, ¶¶ 40–41, 528 P.3d 1221. Also, in *Spencer*, the court of appeals' decision can be read as saying that an online review was not capable of a defamatory meaning because it constituted an expression of opinion. 2017 UT App 69, ¶¶ 5, 21–22, 29. In that case, the court acknowledged that when "reviewing claims of defamation that are dismissed for failure to state a claim," the court must resolve whether the statement is susceptible to a defamatory interpretation. *See id.* ¶ 5. But without answering that question explicitly, the court determined that because the online review was an opinion, and none of the underlying facts were defamatory, the district court had correctly dismissed the plaintiff's claim. *See id.*

(continued . . .)

to keep these inquiries analytically separate because while the question of whether a statement is a constitutionally protected opinion is one for the court, the question of whether the statement is defamatory belongs to the trier of fact.[18]

¶98 There is also a lingering question of whether a defamation plaintiff is entitled to an inference, on a motion to dismiss, that a pleaded statement is one of fact. It appears that we have never squarely addressed the question. It is entirely consistent with the respect we afford constitutionally protected speech to not grant a plaintiff the benefit of an inference that a pleaded statement is one of fact and not opinion. Not only does this align with *West*, *id.* at 1018–21, but it comports with what we have said about "denying a nonmoving party the benefit of a favorable interpretation of factual inferences" to "accommodate the respect we accord [constitutional] protections of speech," *Jacob*, 2009 UT 37, ¶ 18 (quoting *O'Connor v. Burningham*, 2007 UT 58, ¶ 27, 165 P.3d 1214).

### 1. Higgins

¶99 In her March 2022 post, Higgins asserted that the ECA "egregiously defrauded the entire community with its gross double standards. Everything they've said about protecting rural life and water resources is a lie." She added that the ECA is "defrauding cattle ranchers." When we run these statements through the factors *West* outlined, we conclude that the statements are facts, not constitutionally protected opinions.

¶100 The common usage or meaning of these words—the first *West* factor—lends support for that conclusion. After all, "defraud" means "to deprive of something by deception or fraud," *Defraud*, MERRIAM-WEBSTER, https://www.merriam-webster.com/diction ary/defraud (last visited Aug. 11, 2025), and "to take something illegally from a person, company, etc., or to prevent someone from having something that is legally theirs, by making statements that are not true," *Defraud*, CAMBRIDGE, https://dictionary.cambridge.o

---

¶¶ 21, 29. The better approach, as mentioned, is to separately analyze whether a statement is capable of defamatory meaning and whether a statement is a constitutionally protected opinion.

[18] And, just to be clear, the ultimate question of whether a statement is defamatory is separate from the question of whether a statement is *capable* of defamatory meaning. That threshold question can be placed before the court by motion.

rg/us/dictionary/english/defraud (last visited Aug. 11, 2025). And "fraud" means the "intentional perversion of truth in order to induce another to part with something of value or to surrender a legal right," as well as "an act of deceiving or misrepresenting." *Fraud*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/fraud (last visited Aug. 11, 2025). When Higgins said that the ECA "defrauded the entire community," including "cattle ranchers," the common meaning of these statements is that Higgins was asserting that Appellants lied or misrepresented things to others.

¶101 Notably, Higgins made her statements as if they were settled facts. In essence, she stated the conclusion that the ECA "egregiously defrauded the entire community with its gross double standards." She added that the ECA "defraud[ed] cattle ranchers." Even assuming that the word "egregiously" amounts to hyperbole, the substance of Higgins's March 2022 post is that the ECA "defrauded" the community. Higgins failed to include any cautionary language indicating that her statements were merely opinions or unproven allegations in a lawsuit. These statements instead are assertions of fact.

¶102 Higgins maintains that the common usage of the words in her statements "indicates that they are not defamatory factual statements regarding Appellants." Higgins cites *Westmont Residential LLC*, in which the court of appeals held that the word "crooks," which, according to Higgins, carries similar connotations that Appellants assert as the basis for their claims, "can carry a criminal connotation, [but] in the context of [the] online review [at issue], the term [was] clearly not being used in this manner." 2014 UT App 291, ¶ 24.

¶103 Words like "fraud" and "defraud," like the word "crooks," can carry criminal connotations in some contexts. *Fraud*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "fraud" as "[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment" and explaining that "[f]raud is [usually] a tort, but in some cases ([especially] when the conduct is willful) it may be a crime"); *see also Defraud*, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "defraud" as "[t]o cause injury or loss to (a person or organization) by deceit; to trick (a person or organization) in order to get money" and referring users to the definition of "fraud"). The best understanding of Higgins's statements is that she was accusing

Appellants of committing crimes and not offering opinions about their character or conduct.

¶104   Higgins also claims that her "statements never reference Appellants' businesses or actions with respect to any of their business." But Higgins does not support this assertion with any case in which we have held that a defendant's statements must reference a plaintiff's business to be actionable for defamation.

¶105   Finally, Higgins maintains that she "is clearly sharing her own conclusions and beliefs about the litigation." For support, she cites to *La Liberte v. Reid*, in which a court held that "accusations of concrete, wrongful conduct are actionable while general statements charging a person with being racist, unfair, or unjust are not." 966 F.3d 79, 93 (2d Cir. 2020) (cleaned up). This does not support Higgins's position; on the contrary, Higgins asserted "accusations of concrete, wrongful conduct"—that the ECA defrauded the community—not "general statements charging a person with being racist, unfair, or unjust," or any other descriptor. *See id.* (cleaned up).

¶106   The second *West* factor—whether the statements are objectively verifiable—also supports the conclusion that Higgins's statements are facts. Whether Appellants "defrauded the entire community," including "cattle ranchers," is a verifiable, specific factual assertion. Indeed, these allegations were the basis of a lawsuit that would have sussed out whether Appellants committed fraud (had Six Mile's first complaint not been dismissed). *See Davis v. Garrity*, No. 2:13CV349, 2013 WL 5745554, *5 (D. Utah Oct. 23, 2013) (holding that factual allegations about a pending lawsuit that are specific in nature, and not vague assertions, are verifiable).

¶107   In *RainFocus Inc. v. Cvent Inc.*, the court of appeals reached a similar conclusion about statements that would be verified in a pending lawsuit. 2023 UT App 32, ¶ 27, 528 P.3d 1221. There, RainFocus sued its competitor, Cvent, for defamation and intentional interference with economic relations based on statements Cvent made in a federal lawsuit against RainFocus, in which Cvent accused RainFocus of trade secret misappropriation and tortious interference. *Id.* ¶ 2. Although the statements before the court of appeals were "sealed" and "classified as private," *id.* ¶ 3 n.3, Cvent "allegedly made statements claiming that RainFocus stole its source code, misappropriated its trade secrets, interfered with its business relationships, or took other bad actions," *id.* ¶ 3. The court of appeals concluded that whether RainFocus stole

source code from Cvent was capable of being objectively verified as true or false, because the statement would be verified in the federal action. *Id.* ¶ 27.

¶108 Higgins asserts that *RainFocus* has "limited utility in analyzing specific statements at issue in these proceedings" because "the actual statements at issue" in *RainFocus* "could not be presented in the opinion." Higgins nevertheless asserts that her statements are distinguishable from those at issue in *RainFocus* as they are "entirely contextualized by the civil lawsuit and reflect her opinions regarding what is shown in the lawsuit's allegations."

¶109 These arguments are unpersuasive. First, the status of the statements in *RainFocus* as sealed and classified as private does not materially undercut that case's value. The court's analysis was "somewhat circumscribed" by that limitation because the court referred to the statements generally, *id.* ¶¶ 3, 25, but the case remains helpful to our analysis of Higgins's statements. We also do not agree that "Higgins'[s] statements are entirely contextualized by the civil lawsuit and reflect her opinions." Higgins did not characterize her statements as mere allegations asserted in a lawsuit. Rather, she stated the allegations as facts, all of which could have been verified in Six Mile's first lawsuit. *See id.* ¶ 27.

¶110 Higgins also argues that "[s]he encourages the verification [of her statements] with the other litigation, not her alleged statements." For instance, in one of her posts, Higgins wrote, "You can look up their affidavits if you'd like their full testimonies." But Higgins failed to include this language in her March 2022 post. And we note that even if she had, she has not cited any authority stating or suggesting that this supports that her statements are opinions. This instead seems to suggest that her statements are verifiable and would have been verified in Six Mile's lawsuit had it not been dismissed.

¶111 In summary, the common usage and the objectively verifiable factors support the conclusion that at least some of Higgins's statements are assertions of fact. We have already evaluated factors three and four—"the full context of the statement" and "the broader setting in which the statement appears"—and concluded that the same statements are capable of defamatory meaning. *See supra* ¶¶ 59–94; *West*, 872 P.2d at 1018; *see* THE LAW OF TORTS § 570 (explaining that factors three and four are relevant to the *meaning* inquiry rather than the opinion inquiry). Specifically, the relevant statements lack rhetorical hyperbole,

exaggeration, and cautionary language that would result in a reasonable reader's determination that the statements should not be taken at face value. *See supra* ¶¶ 85–87. And that reader could understand that Higgins accused Appellants of committing, at minimum, ethically improper conduct. *See supra* ¶¶ 90–91.

¶112   Simply put, the statements Higgins made in her March 2022 post are not constitutionally protected as opinions. To the extent the district court concluded otherwise, it erred.

### 2.  Nielsen

¶113   Nielsen's first statement—that "[t]he Erda sponsors committed fraud that was well documented and part of lawsuits"—is also an assertion of fact, and not a constitutionally protected opinion, when viewed through the *West* lens. The common usage and meaning of the words "committed fraud" and "part of lawsuits" support that this statement is an assertion of fact. Nielsen, like Higgins, makes this statement without including any cautionary language. He uses an assertive tone, presenting Appellants' misdeeds as a settled fact, and he cites the factual basis for the statement. *See Bauer*, 958 N.W.2d at 201; *see also RainFocus*, 2023 UT App 32, ¶ 26.

¶114   Nielsen contends that his statement "that the alleged fraud was 'well documented' . . . [is] nothing more than [a] statement[] of subjective belief—i.e.[,] opinion." Like the word "yelled," *see Spencer*, 2017 UT App 69, ¶ 16, Nielsen argues that the meaning of "well documented" may be understood differently between hearers of those words. In *Spencer*, the court of appeals reviewed whether the statement that Spencer "[y]elled at [Glover] once when [Glover] called to ask [Spencer] about something his office had sent [Glover] that day" was an assertion of fact or opinion. *Id.* ¶¶ 2, 11, 16. The court held that the word "yell" cannot be objectively verified as true or false, supporting that that portion of the statement was an opinion, because "[w]hether a person yelled depends at least to some extent on the hearer," and "what qualifies as a yell to some may not be understood as such by others." *Id.* ¶ 16.

¶115   Based on that logic, Nielsen might be right about the common usage or meaning of the qualifier "well documented." But Nielsen overlooks a critical portion of his first statement, in which he declares that the "Erda sponsors committed fraud"—words that, in their common usage or meaning, could be interpreted as stating actual facts about the individuals involved. *See Hustler Mag., Inc. v.*

*Falwell*, 485 U.S. 46, 50 (1988); *cf. Spencer*, 2017 UT App 69, ¶ 16 (concluding that, even though "yelled" could not be objectively verified as true or false, "whether Spencer told Glover to google something [could] be"). In other words, Appellants did not premise their defamation action on the assertion that the fraud is well documented; they centered it on the assertion that they committed fraud.

¶116 Nielsen, too, argues that his comments are not defamatory because they do not accuse Appellants of specific criminal conduct. He says he "never uses the words 'crime' or 'criminal' and . . . refer[s] to the <u>civil</u> claims asserted in the Six Mile lawsuits." But regardless of whether he "impute[d] criminal conduct to either Appellant personally in any of his statements," a reasonable reader could perceive him to have declared that Appellants committed "ethically improper conduct." *West*, 872 P.2d at 1010. This is especially true when we consider the definition of fraud: "A knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment." *Fraud*, BLACK'S LAW DICTIONARY (12th ed. 2024). The definition notes, "Fraud is [usually] a tort, but in some cases ([especially] when the conduct is willful) it may be a crime." *Id.*

¶117 Nielsen further argues that his "broader comments that accompany his statements about fraud confirm he was expressing opinions about the Six Mile litigation." He cites the following as examples: "the courts need to hear this in detail," "there is a judge who follows the law," and "[t]here is more . . . which must come to light." He proclaims that "[t]hese comments about how the Six Mile lawsuits should be litigated, how the proceedings are unfolding, and what steps [he] believe[s] need to be taken are all matters of opinion." Notably, none of these comments appeared in Nielsen's first statement, which we have concluded is capable of a defamatory meaning. Nielsen fails to show us how comments made three and four months after his first statement would indicate that the first statement is a constitutionally protected opinion.

¶118 Application of the second *West* factor yields the same conclusion. Indeed, whether Appellants engaged in fraud is capable of being objectively verified and may be verified in Six Mile's pending lawsuits. *See RainFocus*, 2023 UT App 32, ¶ 27. Nielsen contends that *RainFocus* is inapplicable because he is not a party to any of the relevant lawsuits. He argues that "the *RainFocus* court expressly held its decision does not apply when the statement

at issue describes allegations made by a third party in a separate legal proceeding." (Citing *id.* ¶ 20.) But the paragraph on which Nielsen relies concerned whether the judicial proceeding privilege applied to the statements at issue, not whether the statements were constitutionally protected as opinions. *See id.* ("But when a party to a lawsuit repeats its own allegations made in the suit, we conclude that the judicial proceeding privilege remains attached to the allegations such that their republishing must abide by the limits of the privilege or fall subject to claims for defamation.").

¶119 Nielsen also argues that his statements lack language indicating they are objectively verifiable, including the phrase "we have evidence." (Citing *id.* ¶¶ 3, 28 (holding that "multiple statements," including "we have evidence," have a plain meaning and verifiability that are "*clearly factual*" (emphasis added)).) Although Nielsen's first statement lacked that exact language, it contained other language indicating it is verifiable. For instance, he states that "[t]he Erda sponsors committed fraud which was . . . *part of lawsuits*." (Emphasis added.) Nielsen not only described verifiable actions, but he informed readers how such actions would be verified. Contrary to his characterization of his statements, the relevant statement is not merely a "comment[] about how the Six Mile lawsuits should be litigated, how the proceedings are unfolding, and what steps Nielsen believe[s] need to be taken." Because Nielsen's statement that the Erda sponsors committed fraud failed to carry "verbal signals indicating opinion," *see id.* ¶ 28, it is an assertion of fact.

¶120 Nielsen additionally contends that his statements' references to Six Mile's lawsuits, including one in which he posted a link to Six Mile's first complaint, support that they are non-verifiable expressions of opinion. He claims that by referencing the lawsuits, a reasonable person would know that his statements are his "interpretation of the claims and allegations in the Six Mile complaint," rather than objectively verifiable statements. In support of this argument, Nielsen cites a case out of the United States Court of Appeals for the Ninth Circuit, in which the court noted that "[w]hen the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts." (Quoting *Standing Comm. on Discipline of U.S. Dist. Ct. for the Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995).)

¶121 But Nielsen's argument assumes what it sets out to prove—that his statements are opinions. Indeed, the Ninth Circuit made this statement to explain "[t]he rationale behind" the rule that "[a] statement of opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." *Yagman*, 55 F.3d at 1439. Nielsen's first statement also lacks language suggesting that the statement is his interpretation of the claims and allegations in the complaint. Nielsen emphasizes that a reasonable person would necessarily understand his "use of the term 'fraud' as exaggerated language expressing his feelings about the alleged actions outlined in" Six Mile's complaint, but we disagree. Nothing about that usage indicates that his statement is his interpretation of the claims. The statement asserts a fact.

¶122 Applying the first and second *West* factors, Nielsen's first statement is a factual assertion. We have already assessed the statement's context. *See supra* ¶¶ 59–85, 88–94. That is, based on the statement's content and tone, including the omission of any cautionary language, hyperbole, or exaggeration, a reasonable reader could take the statement at face value. *See supra* ¶¶ 85, 88. We also concluded that a reader could reasonably understand that Nielsen accused Appellants of committing crimes or, at minimum, ethically improper conduct. *See supra* ¶¶ 90–91. To the extent the district court dismissed Appellants' defamation claim against Nielsen because all his statements are constitutionally protected opinions, it erred. Nielsen's first statement is an assertion of fact and can be the basis of Appellants' defamation claim against him.

C. *The District Court Erred When It Dismissed Appellants' Claims on the Basis of Privilege*

¶123 The district court also concluded that, regardless of whether Higgins's and Nielsen's statements were capable of defamatory meaning, their statements were privileged. The court held that Utah's public-interest, fair-report, and fair-comment privileges applied as a matter of law and necessitated the dismissal of Appellants' defamation claims against Higgins and Nielsen.

¶124 Appellants argue that it is inappropriate to decide the privilege question on a motion to dismiss. We acknowledge that we have been less than clear in how we have talked about privilege in the defamation context. At times, we have said things like, to "state a claim for defamation, [a plaintiff] must show that defendants published . . . statements . . . not subject to any privilege." *West*, 872 P.2d at 1007; *see also Wayment*, 2005 UT 25, ¶ 18 n.2. Other times, we

have talked about privilege as an affirmative defense to defamation. *See Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 59 (Utah 1991); *see also Price v. Armour*, 949 P.2d 1251, 1256 (Utah 1997) (holding that "[a] privilege protects those who make otherwise defamatory statements from legal liability").[19]

¶125  The question before us—what a plaintiff must plead to survive a rule 12(b)(6) motion to dismiss that asserts privileges—is a question of first impression. But we are not entirely without guidance. In *Brehany*, we held that a defamation plaintiff's failure to anticipate an affirmative defense in her complaint did not bar her from later overcoming that defense when raised in a motion for a directed verdict at trial. 812 P.2d at 59.

¶126 After Nordstrom fired Brehany and two other employees, the former employees sued Nordstrom for wrongful discharge, breach of contract of employment, intentional infliction of emotional distress, and defamation. *Id.* at 52. The plaintiffs' defamation claims were based on statements Nordstrom made in meetings with managers and buyers, in which "the most that can be said [about] or imputed [to the statements] is that Nordstrom [said] . . . that the plaintiffs' terminations were related to drugs." *Id.* at 59. The plaintiffs went to trial on their defamation claims. *See id.* at 52. Relevant here, "[a]t the close of all evidence, the trial court granted Nordstrom's motion for a directed verdict as to the plaintiffs' defamation claims on the ground that the defamatory statements . . . were privileged communications." *Id.*

---

[19] Privileges play an important role in our defamation caselaw. We have recognized "[a]bsolute privileges," which "are granted to those whose position or status requires that they be free from liability stemming from their actions." *Price*, 949 P.2d at 1256. We have also written about conditional privileges, which are also known as qualified privileges. *See Brehany*, 812 P.2d at 58. "[A] publication is conditionally privileged if made to protect a legitimate interest of the publisher." *Id.*

"Whether a publication is conditionally privileged is a question of law, unless a genuine factual issue exists regarding whether the scope of the qualified privilege has been transcended or the defendant acted with malice." *Wayment*, 2005 UT 25, ¶ 53 (cleaned up). Accordingly, a plaintiff may overcome a conditional-privilege defense if he can show that the defendant acted with malice or if the scope of the privilege has otherwise been exceeded. *See id.*

¶127   The plaintiffs appealed the dismissal of their defamation claims. At trial, Nordstrom had argued that statements its employees made about Brehany's drug use were privileged. *See id.* Nordstrom argued on appeal that Brehany "waived the issue of malice by failing to allege malice in her amended complaint." *Id.* at 59. We rejected that argument, noting that Brehany need not have "anticipate[d] an affirmative defense in her complaint." *Id.*

¶128   Although *Brehany* concerned a motion for a directed verdict at trial, our reasoning in that case is instructive here. To satisfy her pleading burden, a plaintiff need not anticipate affirmative defenses that might be raised in a defendant's answer. After all, the Utah Rules of Civil Procedure place the burden of pleading affirmative defenses on defendants, requiring them to set forth any applicable affirmative defenses in a responsive pleading. *See* UTAH R. CIV. P. 8(c).

¶129   The court of appeals has reached a similar conclusion. In *Zoumadakis v. Uintah Basin Medical Center, Inc.*, it held that a plaintiff's "failure to set forth any allegation in her complaint that a qualified privilege applied and that the privilege had been abused because 'defendant[s] acted with malice or that the publication of the defamatory material extended beyond those who had a legally justified reason for receiving it'" was not fatal in the context of a motion to dismiss. 2005 UT App 325, ¶ 7, 122 P.3d 891 (quoting *Brehany*, 812 P.2d at 58). The court reasoned that

> the burden of pleading the inapplicability of a qualified privilege is not initially on the plaintiff as a prerequisite to stating a claim for defamation; instead, the defendant must first raise privilege as an affirmative defense in a responsive pleading in order to shift the burden to the plaintiff to show the inapplicability of a qualified privilege.

*Id.* ¶ 6.

¶130   The court of appeals acknowledged that we had said that to state a claim for defamation, a plaintiff must show that the challenged statements are not subject to any privilege. *Id.* ¶ 6 n.4. But the court of appeals concluded that those statements should not be read as a pleading burden, but as the "the proper allocation of the ultimate burden of proof when the affirmative defense of privilege is raised in a defamation case." *Id.* Otherwise, "[i]f the plaintiff fail[ed] to anticipate and rebut any and all possible privilege defenses in her complaint, the defendant simply has to

move to dismiss for failure to state a claim under rule 12(b)(6), without ever shouldering the burden of showing that a privilege applies." *Id.*

¶131 A federal district court, applying Utah law, adopted *Zoumadakis*'s reasoning. In *Jones v. Suntec Concrete, Inc.*, the court concluded that the defendants "jumped the gun" in seeking dismissal in their rule 12(b)(6) motion based on a qualified privilege. No. 2:22-CV-271, 2023 WL 5311393, *1 (D. Utah Aug. 17, 2023) (cleaned up). The court explained that this was because "a qualified or conditional privilege is an affirmative defense to defamation that a defendant must raise in its answer." *Id.* (cleaned up). Privilege, in turn, was not something that a plaintiff had to disprove by alleging facts in their complaint. *See id.*

¶132 This approach mirrors the one the Second Restatement of Torts has taken. The Restatement provides that while defamation plaintiffs have the burden of proving "the abuse of a conditional privilege," defendants must first "properly raise[]" the issue. RESTATEMENT (SECOND) OF TORTS § 613(1) (AM. L. INST. 1977); *see id.* § 613(2) ("In an action for defamation the defendant has the burden of proving, when the issue is properly raised, the presence of the circumstances necessary for the existence of a privilege to publish the defamatory communication.").[20]

¶133 Higgins and Nielsen have different reads on Utah law. Higgins claims that we can distinguish *Zoumadakis* because Zoumadakis's allegations did not demonstrate the applicability of the privileges, while Appellants' allegations did. For support, she cites at least one case in which a court explained that the general rule is that "complaints do not have to anticipate affirmative defenses to survive a motion to dismiss." *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005). But an exception occurs where "the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." *Id.* Yet Higgins does not explain

---

[20] Utah's model civil jury instructions are also consistent with this approach. Although the "Elements of a Defamation Claim" instruction lists "the statements were not privileged" as an element the plaintiff must prove to succeed on his claim, it explains that the element "need not be [proven] in a case where either no privilege has been asserted or the court has determined that the privilege is inapplicable." *See* MODEL UTAH JURY INSTRUCTIONS 2D CV1602, https://legacy.utcourts.gov/muji/?cat=1&subcat=16.

how Zoumadakis's allegations failed to demonstrate the applicability of the qualified privilege at issue, nor does she propose an administrable way to determine when a plaintiff's allegations demonstrate the applicability of a qualified privilege.

¶134 In any event, regardless of whether Zoumadakis's allegations demonstrated the applicability of an affirmative defense, the court of appeals held that it was improper for the district court to dismiss her defamation claim at the motion to dismiss phase on the grounds that the statements were subject to a qualified privilege. *See Zoumadakis*, 2005 UT App 325, ¶ 5. And Higgins does not attempt to explain away that holding.

¶135 Higgins makes a similar argument about *Bright v. Sorensen*, 2020 UT 18, 463 P.3d 626. There, we addressed whether the plaintiffs "pleaded themselves out of court . . . by pleading detail that was not required, but that nonetheless established that their claims were time-barred as a matter of law." *Id.* ¶ 47. The "detail . . . not required" included "the plaintiffs' allegations of fraudulent concealment," which, if shown, might have the effect of making timely "an otherwise time-barred claim." *Id.* ¶¶ 47–48. We concluded the defendants were not entitled to dismissal in light of the plaintiffs' allegations of fraudulent concealment. *See id.* ¶ 47. The plaintiffs had "made all of the allegations that the [statute] require[d] to toll the statute of limitations period," and "they had no obligation to plead the terms and conditions of fraudulent concealment." *Id.* ¶ 51. Put another way, the plaintiffs were not obligated to plead against the affirmative defense that the plaintiffs' claims were time-barred to avoid dismissal. *Id.* ¶¶ 47, 51; *see also id.* ¶ 35 ("Fraudulent concealment is raised as a response to an anticipated affirmative defense—that plaintiffs' claims are time-barred.").

¶136 Higgins asserts that "[u]nlike the claim at issue" in *Bright*, "a plaintiff in a defamation case has the ultimate burden of demonstrating that the statements at issue are not privileged (*e.g.* to ultimately disprove a claim of privilege)." But our conclusion in *Bright* did not rest on what the plaintiffs' ultimate burden was. Importantly, we held that the plaintiffs were not required to include allegations about fraudulent concealment, made in anticipation of an affirmative defense, to survive dismissal. *See id.* ¶¶ 35, 51.

¶137 Nielsen relies on the court's declaration in *Lewis* that "where[] . . . the allegations of the complaint itself set forth

everything necessary to satisfy the affirmative defense," the plaintiff must plead around privilege. 411 F.3d at 842. But Nielsen, like Higgins, fails to explain what it means for a plaintiff to "set forth everything necessary to satisfy the affirmative defense" in her complaint, especially where we are dealing with the affirmative defense of privilege as compared to statute of limitations, the affirmative defense at issue in *Lewis. See id.*

¶138   Nielsen additionally cites *Westmont Maintenance Corp. v. Vance* as support for the argument that a defamation plaintiff must anticipate an affirmative defense and plead around it. 2013 UT App 236, ¶¶ 12–15, 17, 313 P.3d 1149. In that case, the district court granted the defendant's motion to dismiss the plaintiff's defamation claim. *Id.* ¶ 5. The court of appeals affirmed, because the defendant's statements were subject to the judicial proceeding privilege, an absolute privilege. *Id.* ¶¶ 13–17.

¶139   Nielsen also invokes *Riddle v. Perry*, in which we affirmed the district court's grant of the defendant's motion to dismiss on the basis that the legislative proceeding privilege applied to the allegedly defamatory statement. 2002 UT 10, ¶¶ 16–19, 40 P.3d 1128. We determined for the first time that the legislative proceeding privilege was an absolute privilege but noted that "even if we found that legislative witnesses are covered by only a qualified privilege, . . . [the defendant's] statement would still be privileged." *Id.* ¶¶ 7, 18 n.1.

¶140   Nielsen uses *Vance* and *Perry* to argue that the district court did not err when it dismissed the complaint based upon privileges. The problem with this argument is that the *Vance* and *Perry* parties seemingly did not argue about what a plaintiff must plead to survive a motion to dismiss asserting privilege. Both of those cases centered on whether the specific privileges at issue applied to the allegedly defamatory statements. *See id.* ¶ 6 (explaining that one of the issues raised on appeal was "whether the trial court erred in holding that a statement made by a voluntary witness before a legislative committee [was] privileged"); *Vance*, 2013 UT App 236, ¶ 10 (stating that "we review for correctness the district court's determination that the judicial proceedings privilege applies to [the defendant's] letters"). As such, they do not shed much light on the question Appellants have placed before us here.

¶141   Finally, Nielsen contends that requiring a plaintiff to plead around an affirmative defense in the complaint to survive a

motion to dismiss comports with our "strong preference for pretrial resolution of legally deficient defamation claims." (Citing *West*, 872 P.2d at 1015.) Although we conclude that a defamation plaintiff need not anticipate and preemptively plead against an affirmative defense, we do not hold that questions of privilege are immune from pretrial motion practice.

¶142 In *Moss v. Parr Waddoups Brown Gee & Loveless*, we rejected the plaintiff's argument that "the district court erred in even considering the affirmative defense of the judicial proceedings privilege in granting judgment on the pleadings." 2012 UT 42, ¶ 27 n.5, 285 P.3d 1157. We explained that the plaintiffs were conflating "the procedural posture of a 12(b)(6) motion to dismiss with a 12(c) motion for judgment on the pleadings." *Id.* We went on to say,

> When a defendant moves to dismiss for failure to state a claim under rule 12(b)(6), the motion is based on the insufficiency of the plaintiff's complaint standing alone. By contrast, a motion for judgment on the pleadings under rule 12(c) invites consideration of all pleadings—namely, the plaintiff's complaint and the defendant's answer—in determining whether dismissal is appropriate.

*Id.*

¶143 By distinguishing between these procedural postures, we analyzed the pleading-burden question in a way that we did not in *Perry*. Building on what we said in *Moss*, when a defendant moves to dismiss for failure to state a claim under rule 12(b)(6) of the Utah Rules of Civil Procedure, it is improper for a court to dismiss the claim based on an affirmative defense—like a conditional privilege—raised in the motion. But evaluating whether a dismissal is justified based on an affirmative defense remains appropriate on a motion for judgment on the pleadings (where the pleadings contain all the information needed to decide the motion) or a motion for summary judgment (where there is no genuine issue of material fact on the privilege question).

¶144 For these reasons, the district court erred when it considered more than the sufficiency of Appellants' complaint and

dismissed Appellants' claims against Higgins and Nielsen on the basis that their statements were privileged.[21]

D. *The District Court Erred to the Extent It Held that the Group Defamation Rule Bars Appellants' Defamation Claims*

¶145   Higgins and Nielsen argue that the group defamation rule justifies dismissal of the defamation claims asserted against them. They claim that their statements do not explicitly name Appellants and that Appellants' identities are not ascertainable from the statements.

¶146   To prevail on a claim for defamation, a plaintiff "must show that [the] defendants published the statements *concerning*" the plaintiff. *West*, 872 P.2d at 1007 (emphasis added). A plaintiff must demonstrate that the "statements refer to some ascertained or ascertainable person." *Pratt v. Nelson*, 2007 UT 41, ¶ 52, 164 P.3d 366 (cleaned up). A plaintiff "may show this by directly being named, or so intended from the extrinsic facts and circumstances." *Id.* (cleaned up). "Where defamatory statements appear to apply to a particular class of individuals, and are not specifically defamatory of any particular member of the class, an action can still be maintained by any individual of the class who may be able to show the words referred to himself." *Id.* (cleaned up).

¶147   A defendant "may defend itself from allegations of defamation with the group defamation rule." *Id.* ¶ 53. This rule provides that "[i]f the defamatory matter has no special application and is so general that no individual damages can be presumed, and the class referred to is so numerous that great vexation and oppression might grow out of a multiplicity of suits, no private suit can be maintained." *Id.* (cleaned up).

¶148 Plaintiffs have overcome the group defamation rule "[w]here the defamation is of a comparatively small group," including "where he or she was an unnamed member of an election board of four members, . . . a jury of 12," and "11 public sexual

---

[21] Because we hold that Appellants need not have anticipated and pleaded against privilege in their complaint to survive the motions to dismiss, we do not reach Appellants' arguments about whether the specific privileges on which Higgins and Nielsen rely apply.

assault accusers." David Elder, DEFAMATION: A LAWYER'S GUIDE § 1:32 (Oct. 2024 update) (cleaned up) (citing cases).

¶149 Higgins argues that her "statements refer to the Incorporation Sponsors, ECA, and city sponsors." She contends that "[t]hese groups have numerous members, none of which are directly mentioned by Higgins's statements." Some of her statements, moreover, "do not refer to any groups, let alone individual members." Finally, she claims that Appellants themselves have "downplayed their own involvement in the incorporation efforts," undermining the conclusion that their identities are ascertainable from her statements.

¶150 Nielsen similarly contends that none of his statements identify either Appellant by name. He maintains that while his first statement referenced the "Erda sponsors," and he concedes that Sorensen is part of that group, he argues that the reference to "Erda sponsors" would not necessarily be understood as a reference to Sorensen—"one of many sponsors and supporters of the Erda incorporation measure." He also argues that Mathews cannot sustain a defamation claim against him because Mathews cannot even identify a statement in which Nielsen refers to him, either individually or as part of an ascertainable group.

¶151 Appellants do not dispute that Higgins's and Nielsen's statements fail to identify Appellants by name. They argue instead that "[g]iven the references to pleadings and affidavits, the context and broader setting, a reasonable reader understands that Appellees directed their defamatory attacks at Appellants."

¶152 We addressed similar arguments in *Pratt*, 2007 UT 41. In that case, Nevin and Denise Pratt sued Mary Ann Nelson and her attorneys (the Nelsons) for statements that the Nelsons made and distributed to the media during a press conference. *Id.* ¶ 1. The press conference concerned a lawsuit the Nelsons had filed in which they named the Pratts, among hundreds of others, as defendants and asserted claims of negligence, civil conspiracy, intentional and negligent sexual abuse of a child, assault, battery, false imprisonment, and intentional and negligent infliction of emotional distress. *Id.* ¶ 4. They alleged that when Mary Ann Nelson was sixteen years old, her father allegedly forced her to marry her uncle. *Id.*

¶153 At the press conference, the Nelsons did not mention the Pratts by name but generally referred to "the 'society,' the 'organization,' and 'the Order.'" *Id.* ¶ 5. The Nelsons also

distributed copies of their complaint at the press conference. *See id.* ¶ 36. The complaint not only named the Pratts as defendants, but it further named them "in a list with 240 other defendants known as 'Order Individuals,' and referred to these 'Order Individuals' as 'Order Members.'" *Id.* ¶ 56.

¶154   The Nelsons argued that "under the group defamation rule, the large size of the groups referenced in their statements," including in the complaint, barred the Pratts' defamation claim against them. *Id.* ¶¶ 56–57. We disagreed. *See id.* ¶ 57. Because the complaint mentioned the Pratts, we concluded that "even the Nelsons' other statements might be viewed as referring to the Pratts as well." *Id.* We held that "[w]hen statements explicitly refer to individuals by name, regardless of whether the individuals are part of a general group or larger listing of names, a party cannot rely on the group defamation rule as a defense." *Id.* We explained that "if a party generally refers to a group of people that happens to include 400 individuals, then the group defamation rule may have application; but to the extent that a party identifies people in that group by their individual names, the group defamation rule no longer applies." *Id.* And even if a defamation plaintiff fails to show that he is "directly . . . named," the statement "may be regarded as actionable" if he can show that, "from the extrinsic facts and circumstances," it refers to him. *Id.* ¶ 52 (cleaned up).

¶155   Turning first to Higgins's arguments, we find them unavailing. Accepting Appellants' factual allegations as true, this is not a case where it "clearly appears that the plaintiff[s] can prove no set of facts in support of [their] claim." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 7, 342 P.3d 224 (cleaned up). Rather, Appellants have alleged enough to show that from the extrinsic facts and circumstances, Higgins's March 2022 post refers to them. *See Pratt*, 2007 UT 41, ¶ 52. In that post, Higgins referenced "the ECA" and stated that it "defrauded the entire community." She went on, writing that the ECA "defraud[ed] cattle ranchers." For the purposes of this inquiry, we can assume that readers understood that Higgins was discussing Six Mile's first lawsuit. And Appellants, both associated with the ECA, were named as defendants in that lawsuit. *See id.* ¶ 57.

¶156   It is true that the group to which Higgins refers in the relevant statements has "numerous members." But Higgins overlooks that our law accepts that a cause of action based on statements appearing to apply to a particular class of individuals

can "be maintained by any individual of the class who may be able to show the words referred to himself." *See id.* ¶ 52 (cleaned up).

¶157 Appellants have shown that from the extrinsic facts and circumstances—especially because Appellants are named defendants in Six Mile's first lawsuit—Appellants could be ascertainable from Higgins's relevant statements. *See id.* We therefore cannot affirm the court's grant of Higgins's motion on this ground.

¶158 Nielsen's first statement warrants the same conclusion. While Nielsen referred to the "Erda sponsors," Sorensen and Mathews could be ascertainable from the statement. Appellants alleged that Sorensen was a sponsor of the Erda incorporation measure and an ECA board member. They also alleged that Mathews founded the ECA, which "worked actively—but quietly—in assisting sponsors of a ballot measure to incorporate the City of Erda." While Sorensen was one of several "sponsors," he can still show "the words referred to himself." *See id.* (cleaned up). And although Mathews was not an incorporation "sponsor," we think that, given his close association to incorporation efforts, he, too, could be ascertainable from "Erda sponsors."

¶159 Nielsen maintains that Appellants failed to allege which of the numerous individuals named as defendants in Six Mile's lawsuits faced allegations of fraud. We take this point; in paragraph 31 of their complaint, Appellants alleged that "Six Mile's central allegations" in its first lawsuit were that "one or more of the Defendants fraudulently modified the request for [the] feasibility study." According to Nielsen, whether "one or more of the Defendants" concerns Sorensen and Mathews is unclear. But Nielsen overlooks that further down in the complaint, Appellants alleged that "the lawsuit falsely alleges Kyle and/or Terry Mathews obtained the Bleazards' signature under false pretenses, and Ryan Sorensen obtain[ed] Judy Warr's signature under false pretenses." While we do not know from the complaint how many defendants were named in Six Mile's lawsuits, we do know that Sorensen and Mathews were. At bottom, Appellants have demonstrated that from the extrinsic facts and circumstances, Sorensen and Mathews could be ascertainable from Nielsen's first statement, which referred to Six Mile's litigation. *See id.*

¶160 Having concluded that Appellants have alleged facts supporting that Higgins's and Nielsen's statements concern

Appellants, we cannot affirm the district court's dismissal of Appellants' defamation claims on this ground.

>   *E. The District Court Erred to the Extent It Held that Appellants Failed to Plead that Higgins and Nielsen Made Their Statements with the Requisite Degree of Fault*

¶161   Higgins and Nielsen also urge us to affirm the district court's dismissal of the defamation claims because Appellants failed to plead that Higgins and Nielsen made their statements with the required degree of fault.

¶162   The First Amendment places limits on how we apply our defamation law. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 771–75 (1986). One force "that may reshape the common-law landscape to conform to the First Amendment . . . is whether the plaintiff is a public official or figure, or is instead a private figure." *Id.* at 775. Caselaw recognizes that "in the realm of defamation law," not all persons are treated equally. *O'Connor*, 2007 UT 58, ¶ 8. In *New York Times v. Sullivan*, the United States Supreme Court held that to succeed in a defamation suit, the First Amendment requires a public official to first establish that the defendant published a defamatory falsehood with actual malice—that is, "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." 376 U.S. 254, 279–80 (1964).

¶163   In *Curtis Publishing Co. v. Butts*, the Court extended that same test to defamation suits brought by public figures.[22] 388 U.S. 130, 163–65 (1967) (Warren, C.J., concurring in the judgment); *see Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335–37 (1974). One might be deemed a public figure "on either of two alternative bases." *Gertz*, 418 U.S. at 351. First, "an individual may achieve such pervasive fame or notoriety that he becomes a public figure for *all purposes* and in *all contexts*." *Id.* (emphases added). Second, "an individual voluntarily injects himself or is drawn into a particular public

---

[22] "The determination of a defamation plaintiff's public figure status is a question of law . . . ." *Wayment*, 2005 UT 25, ¶ 17. "Where the question whether a plaintiff is a public figure can be determined based upon the pleadings alone, [a] [c]ourt may deem a plaintiff a public figure at the motion to dismiss stage." *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013); *cf. Cox*, 761 P.2d at 560 (holding that it could not be determined from pleadings alone that plaintiffs were public officials or figures).

controversy and thereby becomes a public figure for a *limited range of issues*." *Id.* (emphasis added).

¶164 "[T]he Supreme Court further altered state defamation law" when it held that, "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a *private* individual." *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 22, 221 P.3d 205 (emphasis added) (discussing *Gertz*, 418 U.S. at 347, 349). Where cases involve a private plaintiff and a matter of public concern, we require "negligence . . . to establish a claim for defamation." *Id.* ¶ 24; *see also Wayment*, 2005 UT 25, ¶ 32 n.13 ("[A] defamation plaintiff who is not a public figure must still establish negligence on the part of the defendant in order to recover damages."); *Seegmiller v. KSL, Inc.*, 626 P.2d 968, 973 (Utah 1981) (holding that "the necessary degree of fault which must be shown in a defamation action brought by a 'private individual' against the media is negligence").

¶165 Higgins and Nielsen argue that Appellants are limited-purpose public figures and that, as a result, they needed to allege that Higgins and Nielsen made their statements with actual malice to sustain their defamation claims.

¶166 Here, we need not decide whether Appellants are limited-purpose public figures because they have alleged that Higgins and Nielsen made their statements with actual malice— that is, that Higgins and Nielsen made their statements "with reckless disregard of whether they were false or not." *See Jensen v. Sawyers*, 2005 UT 81, ¶ 119, 130 P.3d 325 (cleaned up). A court should grant dismissal under rule 12(b)(6) of the Utah Rules of Civil Procedure only "if it is clear that a party is not entitled to relief under any [set] of facts which could be proved in support of its claim." *Am. W. Bank Members*, 2014 UT 49, ¶ 13 (cleaned up). And although reckless disregard is "substantially subjective," a plaintiff can prove that state of mind if he shows "that the publisher's allegations are so inherently improbable that only a reckless [individual] would have put them in circulation" or if there is "obvious doubt created by the facts." *Ferguson*, 2009 UT 49, ¶ 30 (cleaned up).

¶167 Here, Higgins and Nielsen knew about the lawsuits in which Appellants were named as defendants. And we can infer that, when they made the relevant statements, Appellants knew that the lawsuits had not yet been adjudicated on the merits. Even

though they knew Appellants had not yet been found liable, Higgins and Nielsen "repeatedly and publicly accused [Appellants] of criminal behavior, including (most frequently) fraud and forgery." It follows from this that Higgins and Nielsen had reason to doubt the truth of the statements. *See id.* Even if they "honestly believed [their statements] to be true," we consider both the "subjective inquiry as to the defendant's belief" *and* the "objective inquiry [regarding] the inherent improbability of or obvious doubt created by the facts" when determining whether reckless disregard has been shown.[23] *See id.*

¶168   Nielsen advances two additional arguments about how Appellants failed to plead reckless disregard, neither of which prevails. He first argues that "Appellants failed to plead any facts showing that [he] had serious doubts about the truth of his statements but published them anyway." He next contends that "nothing in the Complaint indicates that [his] statements were so inherently improbable that only a reckless individual would have made the statements."

¶169   Nielsen's first argument rests on the idea that "[r]eckless disregard is a subjective inquiry that 'can be shown by providing sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" (Quoting *Davidson v. Baird*, 2019 UT App 8, ¶ 42, 438 P.3d 928.) Nielsen misunderstands this precedent. First, *Davidson* acknowledges that reckless disregard is not merely subjective. *See id.* Moreover, we have said that reckless disregard exists where "the publisher's allegations are so inherently improbable that only a reckless [individual] would have put them in circulation or" that there is "obvious doubt created by the facts." *Ferguson*, 2009 UT 49, ¶ 30 (cleaned up). Where a defendant believes his statements to be

---

[23] Appellants also alleged that "Defendants made the statements in reckless disregard of their truth or falsity." This is a legal conclusion. Although rule 9(c) of the Utah Rules of Civil Procedure allows plaintiffs to allege "conditions of a person's mind . . . generally," we need not accept a legal conclusion, rather than a pleaded fact, as true on a motion to dismiss. *See Osguthorpe v. Wolf Mountain Resorts, L.C.*, 2010 UT 29, ¶ 11, 232 P.3d 999; *see also Harvey v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 2017 UT 75, ¶ 24 n.6, 416 P.3d 401.

true, we look at both the subjective and objective inquiries. *See supra* ¶ 167.

¶170 And Nielsen's second argument assumes that reckless disregard can be shown only if the publisher's allegations are "so inherently improbable that only a reckless individual would have put them in circulation." *See Davidson*, 2019 UT App 8, ¶ 42 (cleaned up). While that is one way to prove reckless disregard, a plaintiff may also demonstrate that there is "obvious doubt created by the facts." *Ferguson*, 2009 UT 49, ¶ 30. And here, Appellants have alleged enough for us to conclude that, at least for the purposes of the motion to dismiss, there was obvious doubt created by the facts. *See supra* ¶¶ 166–67.

¶171 Even if we could determine from the complaint alone that Appellants are limited-purpose public figures, Appellants have pleaded that Higgins and Nielsen made their statements with actual malice. To the extent the district court accepted Higgins's and Nielsen's argument that Appellants are public figures and failed to plead the degree of fault necessary to sustain their claims, it erred.[24]

## II. THE DISTRICT COURT ERRED WHEN IT CONCLUDED THAT UTAH'S ANTI–SLAPP ACT SHIELDS MCCOWN FROM LIABILITY

¶172 We last consider whether the district court correctly concluded that Utah's Anti-SLAPP Act (the Act) bars Appellants' claims against McCown. Like many states, Utah enacted an Anti-SLAPP statute to protect individuals from "SLAPP" lawsuits, also known as "strategic lawsuits against public participation." *See Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 14 n.2, 116 P.3d 323.

¶173 The Act created a procedure for a "defendant in an action who believes that the action is primarily based on, relates to, or is in response to an act of the defendant while participating in the

---

[24] The district court concluded that because Higgins's and Nielsen's statements were not capable of defamatory meaning and were privileged, Appellants failed to state claims for false light against those Appellees. "A false light claim is closely allied with an action for defamation, and the same considerations apply to each." *Jacob*, 2009 UT 37, ¶ 21 (cleaned up). Because we conclude that the court erred when it dismissed Appellants' defamation claims on these grounds, the court also erred when it dismissed the false light claims.

process of government and is done primarily to harass the defendant." UTAH CODE § 78B-6-1403(1) (2023).[25] A defendant who believes the suit was filed with the primary purpose of harassing the defendant can file "an answer supported by an affidavit of the defendant detailing his belief that the action [was] designed to prevent, interfere with, or chill public participation in the process of government[] and specifying in detail the conduct asserted to be the participation in the process of government" that gave rise to the complaint. *Id.* § 78B-6-1403(1)(a). He may also file a motion for judgment on the pleadings, along with a supporting affidavit. *See id.* § 78B-6-1403(1)(b), (2).

¶174 The district court granted McCown's motion for judgment on the pleadings, which, as noted, he premised on the Act. The court concluded that McCown was participating in a process of government and that the purpose of Appellants' complaint was to prevent or chill public participation in the process

---

[25] Before the district court ruled on McCown's motion, the Legislature repealed and replaced the Act with the Uniform Public Expression Protection Act. *See* Public Expression Protection Act, S.B. 18, 2023 Leg., Gen. Sess. (Utah 2023). We, like the district court, apply the Act that was in effect in 2023.

McCown points to the Act's replacement and contends that "the Court should deny Plaintiffs' appeal because it will not create relevant precedent." He asserts that "the appeal . . . does not present a question regarding the proper interpretation of, or ambiguity in, a current constitutional provision, statute, or rule that is likely to affect future cases." He also argues that "this Court's decision [will not] have any significant precedential value. And Plaintiffs' appeal does not present legal questions of first impression in Utah . . . likely to recur in future cases."

These arguments miss the mark. The considerations McCown raises are those we weigh when we decide whether to grant a petition for a writ of certiorari. *See* UTAH R. APP. P. 46(a) (directing that "[r]eview by a writ of certiorari is not a matter of right, but of judicial discretion, and will be granted only for special and important reasons," including those on which McCown relies). Once we have retained an appeal over which we have original jurisdiction, like here, we are not at liberty to dodge issues that are preserved and briefed even when we can predict that our opinion will have limited precedential value.

of government. Appellants contend that the court erred when it reached both conclusions.

¶175 The Act defined "process of government" as "the mechanisms and procedures by which the legislative and executive branches of government make decisions, and the activities leading up to the decisions, including the exercise by a citizen of the right to influence those decisions under the First Amendment to the U.S. Constitution." *Id.* § 78B-6-1402(4). The Act provided that "government" "includes a branch, department, agency, instrumentality, official, employee, agent, or other person acting under color of law of the United States, a state, or subdivision of a state or other public authority." *Id.* § 78B-6-1402(2).

¶176 If a defendant filed a motion for judgment on the pleadings, the trial court was required to "hear and determine the motion as expeditiously as possible with the moving party providing by clear and convincing evidence that the primary reason for the filing of the complaint was to interfere with the" defendant's "participation in the process of government." *Id.* § 78B-6-1404(1)(b), (2).

¶177 Appellants first contend that the district court erred because McCown's statements were not made while he was participating in the "process of government" as the Act defines that phrase. They rely on two cases for support. *See Anderson Dev. Co.*, 2005 UT 36; *Jacob v. Bezzant*, 2009 UT 37, 212 P.3d 535.

¶178 In *Anderson*, we reviewed a district court's grant of summary judgment on a defendant's Anti-SLAPP Act counterclaim based on an early version of the Act. *See* 2005 UT 36, ¶¶ 35–36. The plaintiff argued that it was entitled to summary judgment on the counterclaim because its lawsuit was directed at activities not materially related to participation in the process of government. *Id.* ¶ 50. We disagreed and reversed, holding that the challenged activity—the defendants' "vocal opposition to [the plaintiff's] zoning application, which was before the City Council"—was sufficient to establish the element of participation in the process of government. *Id.*

¶179 We later addressed whether a subsequent version of the Act protected certain political speech involving elections. *See Jacob*, 2009 UT 37, ¶¶ 7, 9 (analyzing UTAH CODE §§ 78B-6-1402(5), -1403(1) (2008)). American Fork City had adopted ordinances that "stirred debate over whether they prohibited certain city employees from holding a seat on the city council." *Id.*

¶ 2. A week before city council elections, William Jacob prepared and paid for a political advertisement flyer in a local weekly newspaper that said, notwithstanding the city attorney's opinion and the city council's blessing of their candidacy, the ordinances prohibited two individuals from holding office as city council members. *Id.* ¶ 3. The ad, when published, did not contain Jacob's name. *See id.*

¶180 The newspaper's editor, Brett Bezzant, then paid for and published an "Urgent Election Notice" that contained an apology to the two individuals named in Jacob's ad, stating that the ordinances did not prohibit the men from running for city council and disclosing Jacob's identity as the author of the ad. *Id.* ¶ 4. Jacob sued Bezzant, claiming that several Election Notice excerpts contained defamatory language. *See id.* In his answer and counterclaim, Bezzant asserted that the Act protected him. *Id.* ¶ 5. The district court ruled that Bezzant's Election Notice was participation in the process of government because it was political speech regarding election issues. *Id.* ¶ 10.

¶181 We disagreed. We first noted that the Act's plain language was not so broad that it considered all political speech about election issues to be "participation in the process of government." *Id.* We emphasized that the Act limited protection "of citizen participation in the process of government to 'the exercise by a citizen of the right to influence' decisions of the legislature or executive branch of government." *Id.* (quoting UTAH CODE § 78B-6-1402(5) (2008)). We further held that an "election . . . is not an exercise of the right to influence legislative and executive decision making as required by the Anti-SLAPP Act." *Id.* ¶ 15 (distinguishing "citizen decision making" in the process of government and executive and legislative decision making). As evident from "the definition of 'government' in the Act," we determined that the Act did "not protect speech concerning citizen decision making." *Id.*

¶182 We also highlighted two "important factual differences between [that] case and *Anderson*." *Id.* ¶ 12. "First, in *Anderson*, the city council was clearly required to make a decision. It had to decide whether or not to approve [the plaintiff's] zoning application, but the American Fork city council had already made the decision that" the individuals named in Jacob's ad were qualified candidates. *Id.* "Second, in *Anderson*, the citizens clearly intended to influence the city council's decision making." *Id.*

¶183 We examined "both the content of the speech and the context in which it was made" to determine whether Bezzant's speech was an exercise of the right to influence legislative or executive branch decision making. *Id.* ¶ 16. We held that it was not. *See id.* ¶ 17. Although "part of a public debate on the eligibility of candidates for office," Bezzant's speech did not expressly request that American Fork's executive or legislative branch take any action. *Id.* Nor could "it be read to impliedly request that government decision-makers act." *Id.* We also found it significant that the record showed that the decisionmakers were not considering whether to change their policy that the relevant individuals were eligible to run and that at least one decisionmaker was not even aware of the speech. *See id.* While Bezzant's speech "provided information useful to voters in choosing whom to vote for," it was not "an exercise of his right to influence a decision by a legislative or executive branch of government[] . . . and was not protected by the Anti-SLAPP Act." *Id.*

¶184 Here, Appellants base their defamation claim against McCown on numerous statements he made about Erda's incorporation and Six Mile's lawsuits. McCown's statements can be grouped into three categories: (1) those that oppose Appellants' referenda related to Tooele County land-use decisions; (2) those that oppose Appellants' incorporation efforts by informing Tooele County citizens and the Lieutenant Governor's Office of the fraudulent acts and misrepresentations allegedly committed by Appellants, which should have prevented the incorporation effort from appearing on the 2020 ballot; and (3) those that seek to educate and mobilize Erda residents to disincorporate through the initiative process.

¶185 Notably, none of McCown's statements about Erda's incorporation—categories one and two—were made to a legislative or executive branch of government that was "clearly required to make a decision" about Erda's incorporation. *See id.* ¶ 12; *see* UTAH CODE § 78B-6-1402(1), (2), (4). According to the complaint, the government branch responsible for overseeing the process of incorporating municipalities—the executive—had already fulfilled its statutory duties by the time McCown made his statements.

¶186 McCown argues that almost all his actions or statements were intended to stop the executive and legislative branch decision makers from incorporating Erda. He analogizes this case to *Anderson*, 2005 UT 36. But in *Anderson*, the city council had a clear

decision to make; it had to decide whether to approve or deny the plaintiff's zoning application. *Id.* ¶ 50. That is not the case here. McCown has not identified a decision about Erda's incorporation that the executive or legislative branches of government were required to make after citizens passed the ballot measure to incorporate Erda and before Erda received its certificate of incorporation. Nor has he identified any decisions the legislative and executive branches of government had to make about Erda's incorporation after Erda received its certificate of incorporation.

¶187 McCown also argues that because these statements "were motivated by political activity," he "was participating in the process of government" under the Act. Under *Jacob*, that is not enough to claim the Act's protections. Indeed, we held in *Jacob* that the statute's plain language was not so broad that it considered all political speech to be "participation in the process of government." 2009 UT 37, ¶ 10. Rather, we explained that the Act limited protection of citizen participation in the process of government to "the exercise by a citizen of the right to influence" decisions of the legislative or executive branches of government. *Id.* (quoting UTAH CODE § 78B-6-1402(5) (2008)).

¶188 McCown contends that the statements falling into the third category (about disincorporating Erda) qualify as participation in the process of government "because the legislative authority in the State of Utah resides in two separate, but equal bodies—the legislature, i.e., elected representatives and senators, and the voters when deciding direct legislation through referenda and initiates [sic]."

¶189 McCown's argument ignores the Act's plain language. The 2023 version of the Act defined "process of government" as "the mechanisms and procedures by which the legislative and executive *branches* of government make decisions, and the activities leading up to the decisions, including the exercise by a citizen of the right to influence those decisions under the First Amendment to the U.S. Constitution." UTAH CODE § 78B-6-1402(4) (emphasis added). While under "our state constitution, the people's legislative *power* is equal to the Legislature's," *League of Women Voters of Utah v. Utah State Legislature*, 2024 UT 21, ¶ 2, 554 P.3d 872 (emphasis added), Utah voters, even when they exercise that legislative power, are not part of the legislative *branch*.

¶190 McCown still argues otherwise, emphasizing that the Act defines "government" broadly. True enough. *See* UTAH CODE

§ 78B-6-1402(2) ("'Government' includes a branch, department, agency, instrumentality, official, employee, agent, or other person acting under color of law of the United States, a state, or subdivision of a state or other public authority."). But none of McCown's statements "clearly intended to influence" any of the actors the Legislature included in the Act's broad definition of "[g]overnment." *See Jacob*, 2009 UT 37, ¶ 12.

¶191 McCown further maintains that "the law does not require every single statement [he] has made in the process of government [to] influence executive and legislator decision making" for it to be protected. For support, he cites to *Jacob*, in which we stated that "[u]ltimately, the plain language of the definition of the process of government does not require that in all cases a party intended his actions to influence executive and legislative decision making." (Quoting *id.* ¶ 13.) But McCown takes this statement out of context. Indeed, we did not say that citizen actions besides "the right to influence decision making" were protected. *Id.* Rather, we clarified that "the exercise by a citizen of the right to influence" legislative and executive branch decision making was protected under the Act. *Id.* (cleaned up). We explained that "[e]xercising the right to influence decision making *may involve activities in addition to an intent to influence decision making.*" *Id.* (emphasis added). Here, regardless of whether McCown's statements amount to "an intent to influence decision making" or not, *id.*, McCown has not demonstrated that any of his statements were made to influence legislative and executive branch decision making, because no legislative or executive decisions were pending.

¶192 Finally, McCown requests that we apply the factors that we set forth in *Jacob* to determine whether his speech was an "exercise of the right to influence legislative or executive decision making." (Quoting *id.* ¶ 16.) But, again, because McCown has not demonstrated that he engaged in activities to "influence legislative or executive [branch] *decision making,*" *id.* (emphasis added), we decline his invitation.

¶193 McCown's statements do not qualify for protection under the Act's definition of "process of government." *See* UTAH

CODE § 78B-6-1404(1)(b), (2). It follows that the district court erred when it granted McCown's motion.[26]

## CONCLUSION

¶194 The district court erred when it concluded, first, that Higgins's and Nielsen's statements were not capable of defamatory meaning and, second, that various privileges provided an independent basis on which to dismiss Appellants' claims. Appellants pleaded that Higgins and Nielsen each made at least one statement that is capable of a defamatory meaning and is not a constitutionally protected opinion. The district court also erred when it resolved the question of whether the statements were subject to a privilege on a motion to dismiss. The district court similarly erred when it dismissed Appellants' false light claims against Higgins and Nielsen on these grounds. Finally, the district court erred when it granted McCown's motion for judgment on the pleadings premised on the 2023 version of Utah's Anti-SLAPP Act. Under the Act's plain language, and our precedent interpreting the Act, McCown did not make the challenged statements while participating in the process of government. We reverse and remand.

---

[26] For the Act to apply, the primary purpose of the lawsuit must be to harass the defendant. *See* UTAH CODE § 78B-6-1403(1). That is, to "prevent, interfere with, or chill [defendant's] public participation in the process of government." *See id.* § 78B-6-1403(1)(a). Appellants argue that the district court erred because they sufficiently alleged that the primary purpose of their lawsuit is to receive compensation for the harm McCown's statements have caused them. Because we reverse based upon Appellants' process of government argument, we need not reach the parties' arguments about the lawsuit's primary purpose.